# EXHIBIT JC-1



**Jacob Canter**
**(415) 365-7210**
**JCanter@crowell.com**

January 12, 2022

Vɪᴀ Eʟᴇᴄᴛʀᴏɴɪᴄ Mᴀɪʟ

Ms. Maria Crimi Speth
Jaburg Wilk, Attorneys at Law
3200 N. Central Ave., Suite 2000
Phoenix, AZ 85012
mcs@jaburgwilk.com

      Re:    *Erik Johnson v. Proctorio, Inc.*, Case No. 2:21-cv-00691-DLR

Dear Ms. Crimi Speth:

      I write on behalf of Proctorio, Inc. ("Proctorio") in response to the letter sent by Mr. Dan Booth, counsel for Fight For The Future, Inc. ("FFTF"), laying out your client's objections to Proctorio's third-party subpoena in the above-captioned litigation.  As you are aware, Mr. Erik Johnson sued Proctorio in April 2021 for a declaratory judgment of non-infringement and for allegedly making misrepresentations as part of a DMCA takedown, pursuant to 17 U.S.C. § 512(f).  Proctorio thereafter raised defenses, including unclean hands, and counterclaims, including trade libel and tortious interference with contract and/or business expectancy.  The publicly-filed versions of both Mr. Johnson's Complaint and Proctorio's Answer and First Amended Counterclaim ("Counterclaim") are attached herein for your convenience.  *See* Ex. A, B. Moreover, as part of the ongoing litigation between Mr. Johnson and Proctorio, the Court has approved a Protective Order and ESI Protocol, which are also attached for your convenience.  *See* Ex. C, D.

      The objections to the five document requests (the "Document Requests") issued to Fight For The Future outlined in Mr. Booth's letter are unwarranted.  Each request is relevant to claims and defenses in the litigation between Mr. Johnson and Proctorio, and each request fully complies with Federal Rules of Civil Procedure.  Moreover, the need for third-party document discovery is heightened in this particular case due to Mr. Johnson's destruction of relevant evidence, including evidence containing communications with your client.  *See* Ex. E.  Nonetheless, to alleviate any potential burden and to expedite the conferral process, Proctorio agrees to modify its Document Requests consistent as described below.

January 12, 2022
Page 2

## I.   RELEVANT ALLEGATIONS

The Counterclaim explains that since September 2020, Mr. Johnson has consistently published statements about Proctorio that he "either knows are false or misleading, or that he has made with a reckless disregard of their falsity or misleading nature."  Counterclaim, ¶ 10.  Mr. Johnson's false and misleading statements about Proctorio are numerous.  In particular for present purposes, the Counterclaim explains that Mr. Johnson made false public statements that "unlawfully defame Proctorio's executives":

> For instance, in two March 3 tweets, Mr. Johnson twice re-tweeted a black-and-white mugshot-style picture of Mike Olsen, who is described as Proctorio's "creepy CEO," and suggested that Mr. Olsen had developed a "Teenage Lap Cam."  *See* Ex. F (**Mar. 3, 2021 re-tweets**). Mr. Johnson likewise shared an article published on the webpage of an organization called "Fight for the Future"—which, on information and belief, Mr. Johnson and those closely connected to him, including, on information and belief, at least one member of his immediate family, are affiliated with—which falsely described Proctorio's technology as "literally mak[ing] young people film themselves for a spyware app" and suggested Proctorio sent its DMCA notices because "Mike [Olsen] was SO bummed that Erik [Johnson] would dare to interrupt Mike's filming of teenage laps."  *See* Ex. G. The disgusting—and legally unacceptable—implication of these Tweets was apparent.

*Id*. ¶ 19, 19 n. 13.  Images of the tweets that are referenced in these allegations are attached to the Counterclaim and incorporated therein by reference.[1]  The Counterclaim also explains that "Mr. Johnson and his team have directed false, misleading, defamatory, and outright outrageous statements at Proctorio's CEO Mr. Olsen as well—including vile, false, and defamatory suggestions that Mr. Olsen has a prurient interest in children. Exs. F, G."  *Id*. 60.  The "team" referenced here is FFTF.  In even more direct terms, the Counterclaim explains that "[t]o spread [his] false statements, [Mr. Johnson] also acted in concert with sympathetic organizations like 'Fight for the Future.'"  *Id*. ¶ 122.

"Though Mr. Johnson published his false statements in cyberspace, they have real-world consequences," including lost business and reputational damage.  *Id.* ¶ 19.  In addition, the Counterclaim explains that "[t]he false statements have also led to substantial false negative publicity about Proctorio and its leadership. . . . [For example,] the company has been referred to as 'racist' and an 'enemy of students,' and its products called 'spyware.' Moreover, due to Mr. Johnson and certain false and defamatory materials published by your client, Proctorio CEO Mr. Olsen has been referred to as 'a creep,' as hating students, and as 'a pedophile.' None of this is accurate or true."  *Id.* ¶ 80.

---

[1] The Exhibits from the Counterclaim cited in the above paragraph are attached for your convenience at Exhibit F.

January 12, 2022
Page 3

On the basis of these and related allegations, Proctorio has entered discovery to obtain documents and materials that can establish its counterclaims. As stated above, one of the counterclaims is for trade libel. Under Arizona law, trade libel requires proving "intent or knowledge that the publication will result in harm." *FLP, LLC v. Wolf*, 2017 WL 4699490, at *2 (D. Ariz. Oct. 19, 2017) (citing Restatement (Second) Torts § 623A; *Gee v. Pima City.*, 612 P.2d 1079, 1079 (Ariz. Ct. App. 1980)). Similarly, Proctorio has entered discovery to obtain documents and materials that can defeat Mr. Johnson's claims and support its own defenses, including the defense of unclean hands. "To prevail on a defense of unclean hands [under Arizona law], a defendant must demonstrate 'that the plaintiff's conduct is inequitable.'" *World Nutrition Inc. v. Advanced Enzymes USA*, 2020 WL 7123033, at *1 (D. Ariz. Dec. 4, 2020) (quoting *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987)).

## II.   THE SIGNAL LETTER

Approximately one month after the start of discovery, on November 29, 2021, counsel for Proctorio received a letter from counsel for Mr. Johnson. *See* Ex. E (the "Signal Letter"). The Signal Letter states that

> [i]n the course of preparing documents and ESI for production in response to Defendant Proctorio, Inc.'s requests for production, [counsel for Mr. Johnson] learned that some of Plaintiff Erik Johnson's communications through the Signal messaging application ("Signal") were irretrievably deleted by Signal's "disappearing messages" feature.

*Id*. The Signal Letter explains that Mr. Johnson failed to permanently turn off the Signal auto-delete feature until October 6, 2021 and, on one occasion in September 2020, did turn off the auto-delete feature but then subsequently deleted those messages in approximately January 2021.

The Signal Letter identifies that communications with 27 separate persons were irretrievably deleted due to Mr. Johnson's conduct. **One of these correspondents is "Lia Holland." The relationship between Mr. Johnson and Lia Holland is described as "Fight for the Future." The subject of the communications between Mr. Johnson and Lia Holland is described as "Proctorio."** This letter makes clear, by admission of one of the parties in this litigation, that FFTF possesses relevant and discoverable information.

## III.   THE DOCUMENT REQUESTS SEEK MATERIAL RELEVANT TO THE DEFENSES AND COUNTERCLAIMS AND ARE NOT OVERLY BROAD, DISPROPORTIONATE, OR UNDULY BURDENSOME.

Each Document Request seeks material that is relevant to proving claims and/or defenses at issue in this litigation. Moreover, each request complies with the Federal Rules of Civil Procedure, and none of the requests are overly broad, disproportionate, or unduly burdensome.

January 12, 2022
Page 4

- **Request No. 1**:  ALL DOCUMENTS AND COMMUNICATIONS between FIGHT FOR THE FUTURE and PLAINTIFF.

Mr. Johnson has admitted that he coordinated with FFTF about Proctorio.  *See* Ex. E. Proctorio is entitled to discovery regarding the substance of this coordination because it is relevant to the claims and defenses in this dispute.  For example, documents and communications between Mr. Johnson and FFTF are relevant to the trade libel claim because they can shed light on Mr. Johnson's motives to make false and defamatory statements about Proctorio and its executives. Such communications between Mr. Johnson and FFTF where they discuss views about Proctorio or its executives or discuss statements they intend to make about Proctorio and why they intend to make those statements can all establish motive.  Relatedly, documents and communications between Mr. Johnson and FFTF are relevant to, *inter alia*, the unclean hands defense because they can identify whether Mr. Johnson's conduct in relation to Proctorio was inequitable.  For example, documents that Mr. Johnson prepared in tandem with FFTF which make false and defamatory statements about Proctorio's executives, or statements made about Mr. Olsen which evince an intent to punish him, can establish inequity.

- **Request Nos. 2 & 3**:  ALL DOCUMENTS AND COMMUNICATIONS between FIGHT FOR THE FUTURE and [No. 2] EFF / [No. 3] LINKLETTER.

Johnson has admitted that he coordinated with the Electronic Frontier Foundation ("EFF") and with Ian Linkletter about Proctorio.  *See* Ex. E.  Moreover, EFF employees have accused Proctorio of fraud.  Counterclaim, ¶ 60 n. 33.  And Ian Linkletter has made false and defamatory statements about Proctorio and its executives.  Proctorio is entitled to discovery regarding whether any of the communications made by EFF or Linkletter regarding Proctorio, or any of the actions taken by either EFF or Linkletter regarding Proctorio, were coordinated with FFTF.  Documents and communications on these topics may be relevant to, *inter alia*, the trade libel counterclaim, the tortious interference counterclaim, the copyright infringement counterclaim, and the unclean hands defense.

- **Request Nos. 4 & 5**:  ALL DOCUMENTS AND COMMUNICATIONS RELATED TO [No. 4] the PROCTORING SOFTWARE INDUSTRY / [No. 5] DEFENDANT.

As already explained herein, Mr. Johnson has admitted that he coordinated with FFTF about Proctorio.  *See* Ex. E.  Also, the Counterclaim alleges that FFTF and Johnson were a "team" in their defamation of Proctorio and its executives.  *See* Counterclaim, ¶ 122.  Proctorio is entitled to discovery regarding Proctorio and the proctoring software industry as this is relevant to the coordinated action FFTF and Mr. Johnson took against Proctorio.  For example,

Proctorio is entitled to discovery regarding both FFTF's documents and communications related to Proctorio, and the industry where Proctorio operates.  For example, internal statements or stratagems developed by FFTF may have been communicated to Mr. Johnson through means

January 12, 2022
Page 5

that are not available via discovery in this litigation—perhaps orally, but more notably, through the Signal communications that Mr. Johnson allowed to be destroyed in violation of his preservation obligations.

## IV.    THE DOCUMENT REQUESTS ARE NOT RETALIATORY.

As already explained, the purpose of the Document Requests is to seek documents and communications that can shed light on the claims and defenses at issue in this litigation, including *inter alia* the unclean hands defense and the trade libel counterclaim. The documents and communications sought as part of the Document Requests, as explained herein, are relevant to proving and disproving these claims and defenses. These are legitimate document requests consistent with the obligations placed on litigants in federal court, and there is nothing at all retaliatory about them.

Moreover, the recent revelation from Mr. Johnson that he destroyed evidence makes the need to seek discovery from third-parties more pressing. *See* Ex. E. It is likely that the Signal correspondence that has been deleted contained communications that would shed light on the same topics that Proctorio is seeking to discover here.

## V.    THE DOCUMENT REQUESTS DO NOT SEEK PRIVILEGED OR PUBLICLY AVAILABLE MATERIALS.

The Document Requests do not seek privileged materials, and Proctorio agrees to amend its requests to clarify the same. We note, though, that EFF does extensive non-legal, policy- and advocacy-oriented work related to remote proctoring technology and other subject-matters that are highly relevant to the litigation between Mr. Johnson and Proctorio. Any documents or communications related to EFF's non-legal work do not fall under any privilege. Moreover, and more important, even while EFF acted as Mr. Johnson's counsel, documents and communications provided to FFTF by EFF are not privileged, as their publication to FFTF constitutes waiver of any otherwise-applicable privilege(s).

None of the requests explicitly seek publicly available communications. But to forestall further disputes, Proctorio agrees to amend the Document Requests to clarify that they seek no publicly available materials.

* * * * *

We trust that the above addresses your objections to the Document Requests. Nonetheless, in an effort to expedite this process and to alleviate the need for judicial intervention, we agree to the following modifications to Document Requests.

1. ALL DOCUMENTS AND COMMUNICATIONS between FIGHT FOR THE FUTURE and PLAINTIFF RELATING TO DEFENDANT and the PROCTORING SOFTWARE

January 12, 2022
Page 6

INDUSTRY, excluding any privileged or publicly available materials, from January 1, 2018, to the present.

2. ALL DOCUMENTS AND COMMUNICATIONS between FIGHT FOR THE FUTURE and EFF RELATING TO DEFENDANT and the PROCTORING SOFTWARE INDUSTRY, excluding any privileged or publicly available materials, from January 1, 2018, to the present.

3. ALL DOCUMENTS AND COMMUNICATIONS between FIGHT FOR THE FUTURE and LINKLETTER RELATING TO DEFENDANT and the PROCTORING SOFTWARE INDUSTRY, excluding any privileged or publicly available materials, from January 1, 2018, to the present.

4. ALL DOCUMENTS AND COMMUNICATIONS RELATED TO the PROCTORING SOFTWARE INDUSTRY, excluding any privileged or publicly available materials, from January 1, 2018, to the present.

5. ALL DOCUMENTS AND COMMUNICATIONS RELATED TO DEFENDANT, excluding any privileged or publicly available materials, from January 1, 2018, to the present.

We are available to discuss the contents of this letter over the phone or via Zoom. Please let us know what times work for your schedule. In any event, we look forward to hearing from you no later than **January 21, 2022**.

Yours truly,

_____
Jacob Canter
Gabriel M. Ramsey
Justin D. Kingsolver

CROWELL & MORING LLP
*Counsel for Proctorio, Inc.*

Exhibit A

Eric M. Fraser, 027241
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012
(602) 640-9000
efraser@omlaw.com

Cara Gagliano (*pro hac vice application to be filed*)
Andrew Crocker (*pro hac vice application to be filed*)
Hannah Zhao (*pro hac vice application to be filed*)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
(415) 436-9333
cara@eff.org
andrew@eff.org
zhao@eff.org

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Erik Johnson,

              Plaintiff,

vs.

Proctorio Inc.,

              Defendant.

No.

**COMPLAINT**
(Jury Trial Demanded)

### INTRODUCTION

1.      This is a civil action seeking a declaratory judgment of noninfringement under the Copyright Act, 17 U.S.C. §§ 106, 107, as well as injunctive relief and damages for misrepresentation of copyright claims under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(f), in order to finally quash a campaign of

1   harassment designed to undermine important concerns about software used by
2   universities around the United States to monitor student activity.

3   2.      As a consequence of the COVID-19 pandemic, schools and universities
4   have increasingly adopted surveillance software to observe students as they complete
5   assignments and tests electronically. These "proctoring" computer programs, like the
6   Proctorio Software owned by Defendant Proctorio Inc. ("Proctorio"), are ostensibly
7   intended to ensure adherence to assignment rules and to identify potential cheating by
8   relying on surveillance methods such as face detection,[1] eye movement tracking,
9   keyboard and mouse monitoring, and audio and visual recording. Students, teachers,
10  and civil liberties advocates have noted that such software may compromise student
11  privacy and digital security while exacerbating socioeconomic divides in student
12  performance.

13  3.      Plaintiff Erik Johnson, a college student whose university uses the
14  Proctorio surveillance software, is one such critic. After carefully reviewing publicly
15  available information, including portions of Proctorio's software code, Johnson
16  concluded that the Proctorio software code contradicted Proctorio's claims about its
17  software and raised a number of privacy, security, and equity concerns. To inform his
18  classmates and the public, he shared his conclusions on Twitter, a social media website.
19  To help explain his conclusions, Johnson linked to excerpts of the software's code that
20  he had uploaded to the code-sharing websites Pastebin and GitHub. This code was
21  found in files that were automatically saved to Johnson's computer when he installed
22  the software. Johnson's use of the code was a textbook fair use, and obviously lawful
23  under Section 107 of the Copyright Act.

24  4.      Proctorio promptly responded by pressuring Johnson to delete his code
25  analysis. When Johnson resisted, Proctorio turned to the DMCA to force the material's
26  removal. As a result of Proctorio's false claims, Twitter removed several portions of

27  _____
    [1] Face detection is a technology that detect faces as well as facial movement and
28  direction within an image or video.

2

Johnson's critical commentary, and Pastebin and GitHub removed the code excerpts Johnson shared to support his assertions.

5.      Johnson has made every effort to explain the lawfulness of his conduct to Proctorio, to no avail. To ensure that Proctorio will finally cease its efforts to abuse copyright law to interfere with his speech, Johnson has no choice but to seek a declaration of noninfringement.

### PARTIES, JURISDICTION, AND VENUE

6.      Plaintiff Erik Johnson is an individual domiciled in Libertyville, Illinois.

7.      On information and belief, Defendant Proctorio is a corporation that maintains a principal place of business in Scottsdale, Arizona.

8.      This Court has subject-matter jurisdiction over this claim under the Copyright Act (17 U.S.C. §§ 101 *et seq.*), 28 U.S.C. §§ 1331 and 1338, and the Declaratory Judgment Act (28 U.S.C. § 2291).

9.      On information and belief, Proctorio has sufficient contacts with this district, both generally and in connection to the events herein alleged, that it is subject to the exercise of this Court's jurisdiction.

10.     Venue is proper in this district under 28 U.S.C. § 1391.

### GENERAL ALLEGATIONS

#### A.      Johnson's Speech

11.     Erik Johnson is a security researcher and an undergraduate student in computer engineering at Miami University in Oxford, Ohio. Due to the COVID-19 pandemic, Johnson attended all of his classes virtually from his home in Illinois from August 2020 through December 2020. Although he returned to campus in January 2021, Johnson's courses have continued to be conducted almost exclusively online.

12.     During this period of remote schooling, some of Johnson's instructors have chosen to administer exams using remote exam proctoring software offered by Proctorio (the "Proctorio Software"). On information and belief, the Proctorio Software

works by using eye tracking, face detection, and computer monitoring to surveil exam-takers and flag allegedly "suspicious" behaviors as possible indications of cheating.

13.     Like many other students, Johnson was concerned about the Proctorio Software, including the risks it poses to students' privacy and security. Currently, Johnson is a member of a subcommittee appointed by his university's senate tasked with investigating whether or not the use of remote proctoring services such as Proctorio is in line with his university's values. He is the only undergraduate on this subcommittee comprised mainly of graduate students and university officials.

14.     To explore Proctorio's potential harm to students' interests, Johnson examined Proctorio Software files that are automatically downloaded to any computer (including Johnson's) that installs the Proctorio Software: (1) language files, which contain lists of messages that the software is able to display on a computer to the software user ("display messages") in multiple natural (human) languages, including English[2]; and (2) a file written in the computer programming language JavaScript that contained both intentionally scrambled (or "obfuscated") code and non-scrambled plain text.

15.     On September 7, 2020, following his investigation of the software code in these files, Johnson published a tweet thread[3] critiquing Proctorio and the Proctorio Software. Annotated screenshots of these tweets are attached as **Exhibit 1**. Among other things, Johnson's tweets identified contradictions between Proctorio's public statements and the actual functionality of the software as indicated by its code; demonstrated the

---

[2] Language files are used to facilitate software use and adaptation in different countries or regions and allows the software to display the appropriate natural language based on location.

[3] Tweets are user-generated content posted to the social media website Twitter. A thread is a group of tweets linked together by the user who posted them so that the tweets appear in chronological order instead of Twitter's default of reverse-chronological order. Because users can choose whether new tweets they post are linked to any of their existing tweet threads, threading allows for discussions longer than the per-tweet character limit and that span some period of time.

1   invasiveness of the Proctorio Software; illustrated the high level of access that the

2   Proctorio Software has to users' computers; and noted the difficulty of determining the

3   full extent of Proctorio's collection of and access to user data.

4          16.     To illustrate the basis for his conclusions, Johnson included, in three of

5   the September 7 tweets, links to relevant software code that he had excerpted from the

6   language files and uploaded to the website Pastebin.[4] **Exhibit 1** at 1–2.

7          17.     In the first of these tweets, Johnson listed various metrics that the

8   Proctorio Software monitors during exams and apparently uses to determine each exam-

9   taker's "suspicion level." He also linked to a code excerpt of the display messages

10  referencing those same metrics. A printout of that code excerpt is attached as **Exhibit 2**.

11  Among the metrics named in Johnson's tweet and found in the linked code is "eye

12  movement," something Proctorio claims its software does not track.

13         18.     In the second tweet, Johnson discussed how the Proctorio Software

14  compares different exam-takers to one another using these metrics. He also linked to a

15  code excerpt of the display messages for reporting these statistics. A printout of that

16  code is attached as **Exhibit 3**.

17         19.     In the third tweet, Johnson identified various reasons the Proctorio

18  Software may terminate a student's exam, such as interruptions in internet connectivity

19  and plugging in an additional monitor. He also linked to a code excerpt listing the

20  display messages for 20 different bases for exam termination. A printout of that code is

21  attached as **Exhibit 4**.

22         20.     In another of his September 7 tweets within the tweet thread, Johnson

23  reported: "In some cases, you will have to scan your room. At the begining [sic] of the

24  exam, and during if your suspicion level raises. Proctorio compiles the footage into a

25

26         ────────────────
            [4] Pastebin is a website that allows users to upload snippets of text, most often
27  software code, for public viewing. One common use of these "pastes" is to share text
    referenced in a message that is constrained by character limits, such as the 280-character
28  limit for tweets.

1    street-view like 360 image of your room/house that your professor can access and

2    seemingly proctorio 'agents' too." With the tweet, Johnson included a screenshot of a

3    tutorial video showing where these room scan images can be viewed (the "Video

4    Screenshot"). **Exhibit 1** at 2.

5         21.    Over the next week, Johnson continued to post criticisms of Proctorio and

6    the Proctorio Software to the same tweet thread. In one September 11 tweet, Johnson

7    included a Pastebin link to three lines of software code from a JavaScript file that

8    Johnson understood to identify programs blacklisted by Proctorio—*i.e.*, computer

9    programs that cannot be used simultaneously with the Proctorio Software. **Exhibit 1** at

10   6. That code excerpt, a printout of which is attached as **Exhibit 5**, contained only code

11   that was not scrambled in the source file. The purpose of this tweet was to show that

12   Proctorio prevents users from taking steps that could mitigate the intrusiveness of the

13   Proctorio Software, such as using a virtual machine for "sandboxing."[5]

14              **B.    Fair Use**

15        22.    To the extent that the code excerpts associated with Johnson's September

16   7 and September 11 tweets (collectively, the "Excerpts") and the Video Screenshot

17   contained copyrightable material, Johnson's uses of that material are clear-cut fair

18   uses—no different from quoting a book in a book review.

19        23.    The fair use analysis centers on four statutory factors: (1) the purpose and

20   character of the use; (2) the nature of the copyrighted work; (3) the amount and

21   substantiality of the portion used; and (4) the effect of the use on the market for the

22   copyrighted work. These factors are analyzed together in light of the fundamental

23   purposes of copyright.

24        24.    The purpose and character of Johnson's uses are noncommercial and

25   educational, serving many, if not all, of the favored purposes identified in the preamble

26   to Section 107 of the Copyright Act. Johnson used the Excerpts and Video Screenshot

27   ───────────────

28         [5] Sandboxing is a computer-security practice that involves isolating a specific
     program to prevent it from accessing other programs or system resources.

6

1    to report his findings from his investigation of the Proctorio Software and to provide

2    evidence supporting his assertions. The uses are also transformative: they combined the

3    copyrighted material with the expression in Johnson's tweets to add new meaning and

4    serve the new and different purpose of sharing evidence-backed criticism of Proctorio

5    with the public.

6           25.    The nature of the works at issue—Proctorio's software code and tutorial

7    video—also weighs in favor of fair use because they are primarily factual or functional.

8    Moreover, Johnson used the works only for their factual content, not their expressive

9    value.

10          26.    The amount and substantiality of the copyrighted material used also weigh

11   in favor of fair use. Johnson included only those lines of software code that directly

12   supported his tweets. And the Excerpts were a negligible portion—almost certainly less

13   than 0.1%—of the Proctorio Software's code. They also were qualitatively

14   insubstantial: the three language file excerpts contained nothing but message text that

15   would be displayed to someone reviewing exam statistics, and the JavaScript file

16   excerpt contained only a list of blacklisted programs. As to the Video Screenshot,

17   Johnson used a single still frame from the full video to demonstrate the ability of

18   professors using Proctorio, and potentially Proctorio employees, to view 360-degree

19   images of students and their homes.

20          27.    Finally, Johnson's use will not cause market harm—at least not the kind

21   of harm copyright law is designed to remedy. The Excerpts—essentially a list of display

22   messages and types of computer programs—are available to anyone who installs the

23   Proctorio Software and cannot possibly serve as a market substitute for the Proctorio

24   Software. Nor does the Video Screenshot serve as a market substitute for the full

25   tutorial video. And to the extent Johnson's critical uses of the Excerpts may cause

26   Proctorio reputational damage or reduce demand for the Proctorio Software because of

27   what they reveal about it, those are not cognizable market harms under copyright law.

28   *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 591–92 (1994).

1

### C. Proctorio's Campaign of Harassment

2    28.    On September 7, soon after tweeting about Proctorio, Johnson received a

3    private Twitter message from Proctorio's CEO, Mike Olsen. Olsen demanded that

4    Johnson take down the Excerpts, claiming that they violated Proctorio's terms of service

5    and "undermine[d] the integrity of the test-taking process."  Olsen did not identify any

6    copyright-related basis for his demand. In reply, Johnson explained that the Excerpts

7    came from files accessible to anyone who installs the Proctorio Software, and that he

8    did not believe he had agreed to any terms of service before accessing them. A

9    screenshot of the exchange between Olsen and Johnson is attached as **Exhibit 6**.

10   29.    On September 8, Johnson discovered that his IP address had been banned

11   from accessing Proctorio's website and services. As a result, Johnson was forced to seek

12   special accommodations for taking exams that his professors administered through

13   Proctorio.

14   30.    Based on documents obtained through a records request to Miami

15   University, Johnson is informed and believes that on September 9, a Proctorio

16   representative requested that the university ask Johnson to remove any links to Proctorio

17   materials from his tweets. On information and belief, Proctorio again did not cite any

18   copyright-related basis for its request. The university declined to make any such request

19   of Johnson.

20   31.    On October 19, Johnson received an email from Twitter notifying him that

21   the three September 7 tweets that included Pastebin links had been taken down in

22   response to a notice of copyright infringement lodged by Proctorio. The email provided

23   a copy of the DMCA notice, which was signed by Proctorio's marketing director.

24   **Exhibit 7.** The notice also identified the September 7 tweet that included the Video

25   Screenshot as allegedly infringing, but Twitter did not remove that tweet at that time.

26   32.    After receiving the email from Twitter, Johnson discovered that Pastebin

27   had disabled access to the three Excerpts associated with the removed tweets. A notice

28   that appeared in place of each of those Excerpts stated that access had been disabled by

Pastebin on September 28. On information and belief, the Excerpts were removed by Pastebin in response to a DMCA notice lodged by Proctorio. Johnson did not receive notice of the removal from Pastebin, and the material has not been restored.

33.     On October 30, Johnson submitted a counternotice under section 512(g) of the DMCA to Twitter, requesting restoration of his tweets. On November 5, Johnson received an email from Twitter stating that it had found Proctorio's DMCA notices incomplete and had restored Johnson's tweets pending further information from Proctorio.

34.     On or around November 11, Johnson uploaded the Excerpts to GitHub, another code-sharing website, and appended updates to the September 7 and 11 tweets that provided links to the reposted code excerpts. Screenshots of the updated tweets are attached as **Exhibit 8**.

35.     On November 23, GitHub informed Johnson that it had disabled access to the Excerpts in response to a DMCA notice submitted by Proctorio. In addition to its allegations of copyright infringement, the notice also falsely stated that Johnson had obtained the code through "reverse engineering and unauthorized hacking." **Exhibit 9.** Johnson submitted a counternotice on November 24, and GitHub restored access to his content on or around December 9.

36.     On November 29, Johnson discovered that Twitter had once again taken down the three September 7 tweets that were the subject of his October 30 counternotice, without notice to him. In addition, Johnson discovered that Twitter had also removed (1) the Video Screenshot from the fourth September 7 tweet identified in Proctorio's September DMCA notice to Twitter and (2) the September 11 tweet about blacklisted programs, which was not mentioned in the September DMCA notice. Counsel for Proctorio confirmed to Johnson's counsel that Proctorio had submitted a second DMCA notice to Twitter. The Excerpt linked to in the September 11 tweet was also removed by Pastebin, again without sending notice to Johnson.

37. In a November 30 phone call, Johnson's counsel presented Proctorio's counsel with the fair use analysis set forth in paragraphs 22 through 27, *supra*. Proctorio's counsel denied that Johnson's uses were fair, but that denial was premised on multiple misstatements of fact.

38. For example, Proctorio's attorneys repeated the claim from the GitHub notice that the excerpted code could be obtained only by "reverse engineering" and "hacking," which they cited to argue that Johnson's use of the excerpts would harm the market for the Proctorio Software by revealing information (which is not copyrightable) to competitors and exam-takers. On information and belief, Proctorio knew that the excerpted code in fact was contained in unprotected files that could be read by anyone who installed the Proctorio Software (including competitors and exam-takers). *See* **Exhibit 6** (September 7–8 Twitter conversation between Johnson and Proctorio's CEO).

39. Proctorio's counsel also asserted that Johnson had shared the entirety of the Proctorio Software code. On information and belief, Proctorio would have known from even cursory examination of the Excerpts that they represented only a miniscule portion of the software's code.

40. Despite the fact that Johnson linked to the Excerpts in tweets that both directly related to the linked material and were part of a multi-tweet thread wherein he excoriated and exposed Proctorio for what he viewed as shortcomings of the Proctorio Software and misrepresentations by Proctorio, Proctorio nevertheless asserted that the Excerpts were unconnected to any commentary or criticism. On information and belief, Proctorio knew at the time of sending the DMCA notices to Pastebin and GitHub that the Excerpts were in fact uploaded by Johnson specifically to support his critical commentary.

41. Johnson's counsel informed Proctorio's attorneys of all of these inaccuracies. But in subsequent email communications, Proctorio nonetheless continued to assert that Johnson's uses were infringing and did not withdraw its DMCA notices.

42.     On December 22, Johnson submitted to Twitter a counternotice requesting restoration of all content associated with the September 7 and 11 tweets. On January 15, 2021, Twitter notified Johnson that it had found Proctorio's DMCA notices to be invalid and had restored the affected tweets and media.

43.     As a collateral consequence of Proctorio's improper copyright claims, Johnson was informed by a professor that Johnson's application to work in his university's IT Security department will likely be rejected due to his adversarial legal relationship with the school vendor Proctorio.

## CLAIMS FOR RELIEF

### Count 1
### Declaratory Judgment of Noninfringement

44.     Johnson repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint.

45.     There is a real and actual controversy between Johnson and Proctorio regarding whether Johnson's uses of the Excerpts and the Video Screenshot constitute infringement of a copyright interest lawfully held or administered by Proctorio.

46.     Johnson contends that his creation and use of the Excerpts and the Video Screenshot were and are lawful, consistent with the doctrine of fair use, the Copyright Act, and the First Amendment to the United States Constitution, and judicial decisions construing such laws, doctrines, and provisions.

47.     Every time that Johnson has linked to excerpts from Proctorio's software code to comment on and criticize the Proctorio Software, Proctorio has exploited the DMCA to undermine Johnson's commentary.

48.     Proctorio has refused to withdraw its takedown requests. Pastebin has not restored the material that it took down based on Proctorio's claims of infringement.

49.     Proctorio continues to maintain that Johnson's expression is infringing, even in the face of evidence contradicting core assumptions of its legal arguments.

50.     Proctorio's pattern of baseless DMCA notices and its continued refusal to acknowledge Johnson's activity as noninfringing have chilled Johnson from engaging in constitutionally protected speech. Johnson continues to comment on and criticize Proctorio and the Proctorio Software but has not shared materials that support his comments in order to avoid further takedowns and legal threats by Proctorio. He has also refrained from further investigation of the Proctorio Software out of fear that reporting on his findings will elicit more harassment.

51.     Johnson is entitled to a declaration that his use of code excerpts and screenshots to support his commentary does not violate copyright law.

## Count 2

## Misrepresentation Under 17 U.S.C. § 512(f)

52.     Johnson repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint.

53.     Johnson's uses of the Excerpts and the Video Screenshot do not infringe any copyright interest held or administered by Proctorio because they are lawful fair uses under 17 U.S.C. § 107.

54.     On information and belief, Proctorio knew that Johnson's use of the Excerpts and the Video Screenshot did not infringe any Proctorio copyright interest when they sent notices of infringement to Twitter, Pastebin, and GitHub under the DMCA.

55.     Proctorio violated 17 U.S.C. § 512(f) by knowingly materially misrepresenting that Johnson's use of the Excerpts and the Video Screenshot infringed Proctorio's copyrights.

56.     As a direct and proximate result of Proctorio's actions, Johnson has been injured substantially and irreparably. Such injury includes, without limitation, the time and effort associated with responding to Proctorio's multiple fraudulent infringement notices, as well as harm to his free speech rights under the First Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Johnson requests the following relief against Defendant Proctorio:

1.      a declaratory judgment that Johnson's uses of the Excerpts and the Video Screenshot do not infringe any copyright interest held or administered by Proctorio;

2.      an order enjoining Proctorio, its agents, servants, employees, successors, and assigns, and all others in concert and privity with Proctorio, from asserting a copyright claim, including the lodging of a notice of infringement with any third party, against Johnson alleging copyright infringement arising out of use of the Excerpts, the Video Screenshot, or any other excerpts of Proctorio Software code or screenshots of Proctorio materials, in connection with commentary or criticism about Proctorio or the Proctorio Software;

3.      damages according to proof;

4.      attorneys' fees pursuant to 17 U.S.C. § 512(f); other portions of the Copyright Act, including Section 505; on a Private Attorney General basis; or otherwise as allowed by law;

5.      Johnson's costs and disbursements; and

6.      such other and further relief as the Court shall find just and proper.

Plaintiff hereby requests a jury trial for all issues triable by jury, including without limitation those issues and claims set forth in any amended complaint or consolidated action.

DATED this 21st day of April, 2021.

OSBORN MALEDON, P.A.


By  s/ Eric M. Fraser
       Eric M. Fraser
       2929 North Central Avenue, Ste. 2100
       Phoenix, Arizona  85012-2793

13

ELECTRONIC FRONTIER FOUNDATION
Cara Gagliano
    (*pro hac vice application to be filed*)
Andrew Crocker
    (*pro hac vice application to be filed*)
Hannah Zhao
    (*pro hac vice application to be filed*)
815 Eddy Street
San Francisco, California 94109

Attorneys for Plaintiff

Exhibit B

1  Justin D. Kingsolver (AZ Bar No. 035476)
       JKingsolver@crowell.com
2  **CROWELL & MORING LLP**
   1001 Pennsylvania Avenue NW
3  Washington, D.C. 20004
   Telephone: 202-624-2500
4
5  Gabriel M. Ramsey (CA Bar No. 209218)*
       GRamsey@crowell.com
   Kristin Madigan (CA Bar No. 233436)*
6      KMadigan@crowell.com
   Kayvan M. Ghaffari (CA Bar No. 299152)*
7      KGhaffari@crowell.com
   Jacob Canter (CA Bar No. 324330)*
8      JCanter@crowell.com
   **CROWELL & MORING LLP**
9  3 Embarcadero Center, 26th Floor
   San Francisco, California 94111
10 Telephone: 415-986-2800

11    * *Admitted pro hac vice.*

12 *Attorneys for Defendant Proctorio, Inc.*

13

CROWELL & MORING LLP
ATTORNEYS AT LAW

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| Erik Johnson, an individual, | No. 2:21-cv-00691-DLR |
|---|---|
| Plaintiff, | **PROCTORIO INC.'S ANSWER TO PLAINTIFF'S COMPLAINT & FIRST AMENDED COUNTERCLAIMS (WITH JURY DEMAND)** |
| v. | |
| Proctorio, Inc., a Delaware corporation, | |
| Defendant. | |
| Proctorio, Inc., a Delaware corporation, | |
| Counterclaimant, | |
| v. | |
| Erik Johnson, an individual, | |
| Counterdefendant. | |

1

1

2          Defendant Proctorio, Inc. ("Proctorio") hereby answers the Complaint of Plaintiff

3   Erik Johnson ("Plaintiff" or "Mr. Johnson").

4                              **INTRODUCTION**[*]

5          1.       Proctorio admits that Plaintiff has filed a civil action seeking a declaratory

6   judgment of noninfringement, injunctive relief, and damages for misrepresentation under

7   the Digital Millennium Copyright Act ("DMCA"). Proctorio otherwise denies the

8   allegations stated in this paragraph.

9          2.       Proctorio admits that as a consequence of the COVID-19 pandemic and

10  concomitant shut-down of in-person testing, schools and universities have increased

11  adoption of remote proctoring software. Proctorio admits that reasons schools and

12  universities may have for potentially adopting proctoring software include ensuring

13  adherence to assignments and rules, and identifying potential academic dishonesty.

14  Proctorio admits that proctoring programs employ various methods to enable universities to

15  identify potential academic dishonesty and ensure academic integrity. Proctorio denies that

16  its software tracks eye movement. Proctorio admits that, in order to detect academic

17  dishonesty, universities and faculty members can choose to select and activate settings in

18  its software that can identify: (i) head movement that may indicate that the examinee is

19  reviewing information outside of the device, (ii) the general presence of additional faces in

20  the room where the exam is taking place (without identifying any particular face), and (iii)

21  if the examinee leaves the room. Proctorio further admits that, in order to detect academic

22  dishonesty, universities and faculty members can choose to activate settings in its software

23  that can identify excessive keystroke activity (*e.g.*, if a student types 15,000 characters

24  while taking a 50-question multiple-choice exam) or mouse movement. Proctorio admits

25  that only universities and faculty members can choose to trigger settings in its software that

26  _____

27  [*] The section headings in this Answer are provided solely for ease of reference, tracking
    those used in the Complaint, and do not constitute any part of Proctorio's response to the
    allegations in the Complaint or any form of admission as to the truth of the allegations.

28

CROWELL & MORING LLP
ATTORNEYS AT LAW

1  can record limited audio and video for their own purposes, but Proctorio denies that

2  Proctorio can trigger such settings independently without university and faculty

3  involvement.[1]  Proctorio lacks knowledge or information to form a belief as to the truth of

4  the remaining allegations, and therefore denies them.

5       3.      Proctorio admits that Plaintiff is a college student whose university has

6  contracted to use Proctorio software.  Proctorio admits that Plaintiff posted his views

7  regarding Proctorio's software on the social media website Twitter, and that some of

8  Plaintiff's tweets linked Proctorio's copyrighted software code that Plaintiff posted on

9  Pastebin and GitHub.  Proctorio denies that Plaintiff's use of Proctorio's copyrighted

10  material constitutes fair use, much less "a textbook fair use."  Proctorio denies that

11  Plaintiff's use of Proctorio's copyrighted material was lawful under Section 107 of the

12  Copyright Act.  Proctorio denies that its software code is publicly available, as it is subject

13  to, *inter alia*, access controls and Proctorio's terms of service.  Proctorio denies that

14  Johnson engaged in a careful analysis of the software code, or that his review should

15  constitute an "analysis" based on the reasonable understanding of that word.  Proctorio

16  admits that it has and continues to productively address all privacy, security, and equity

17  questions raised about the software, and that whenever good-faith questions about the

18  software's implications for privacy, security, and equity are raised, it has promptly

19  answered them.  Proctorio otherwise lacks knowledge or information to form a belief as to

20  the truth of the remaining allegations, and therefore denies them.

21       4.      Proctorio admits that it has taken appropriate steps to protect its copyrights

22  through informal means, through third-party platforms' "abuse claim" processes, and

23  through the DMCA.  Proctorio denies that it has ever "pressured" Plaintiff to do anything

24  in any way.  Proctorio denies that it made any false claims at any time to any person in

25  

---

26  [1] In response to the allegations in footnote 1, Proctorio denies that the term "face
detection" has only one definition as set forth in footnote 1.  Proctorio admits that some

27  technology can be used to detect the general presence of faces as well as facial movement
and direction within an image or video.  Proctorio denies that it uses any "face detection"

28  with all of the elements described in the definition in footnote 1.

CROWELL & MORING LLP
ATTORNEYS AT LAW

CROWELL & MORING LLP
ATTORNEYS AT LAW

1    relation to its assertion of its legal rights.  Proctorio admits that Twitter, Pastebin, and

2    GitHub all initially removed the copyrighted material, and that Twitter and GitHub restored

3    certain of those materials back onto their respective websites.  Proctorio otherwise lacks

4    knowledge or information to form a belief as to the truth of the remaining allegations, and

5    therefore denies them.

6        5.        Proctorio denies that it committed any unlawful acts at any time it directly

7    or indirectly was asserting its legal rights.  Proctorio denies that Plaintiff has made every

8    effort to work with Proctorio to resolve the dispute between the parties.  Proctorio lacks

9    knowledge or information to form a belief as to the truth of the remaining allegations, and

10   therefore denies them.

11                    **PARTIES, JURISDICTION, AND VENUE**

12       6.        Proctorio admits that Plaintiff is an individual.  Proctorio lacks knowledge

13   or information to form a belief as to the truth of the allegation that Plaintiff—who describes

14   himself as a student at Miami University in Oxford, Ohio who returned to campus three

15   months before the filing of this lawsuit (*see* Compl. ¶ 11)—is domiciled in Libertyville,

16   Illinois, and therefore denies the remaining allegations in this paragraph.

17       7.        Proctorio admits the allegations in this paragraph.

18       8.        Proctorio admits the allegations in this paragraph.

19       9.        Proctorio admits the allegations in this paragraph.

20       10.       Proctorio admits the allegations in this paragraph.

21                        **GENERAL ALLEGATIONS**

22       **A.    Johnson's Speech**

23       11.       Proctorio lacks knowledge or information to form a belief as to the truth of

24   these allegations, and therefore denies them.

25       12.       Proctorio admits that Miami University has contracted with Proctorio to

26   provide remote exam proctoring services.  Proctorio lacks knowledge or information to

27   form a belief as to the truth of the allegation that some of Plaintiff's instructors have

28   chosen to administer exams using Proctorio's software.  Proctorio denies that its software

1    uses eye tracking.  Proctorio admits that, in order to detect academic dishonesty,

2    universities and faculty members can choose to trigger settings in its software that can

3    identify: (i) head movement that may indicate that the examinee is reviewing information

4    outside of the device, (ii) the general presence of additional faces in the room where the

5    exam is taking place (without identifying any particular face), and (iii) if the examinee

6    leaves the room.  Proctorio denies that it determines what constitutes "suspicious

7    behavior," because universities and faculty members make such determinations based on

8    their own academic policies.  Proctorio lacks knowledge or information to form a belief as

9    to the truth of the remaining allegations, and therefore denies them.

10        13.    Proctorio lacks knowledge or information to form a belief as to the truth of

11   these allegations, and therefore denies them.

12        14.    Proctorio admits that only after a user affirmatively agrees to install the

13   Proctorio software are language files and a JavaScript file then downloaded onto a

14   computer.  Proctorio denies that any files are automatically downloaded onto any user's

15   computer without the consent of the user, the instructor of that user's course, and that

16   user's educational institution.  Proctorio denies that the JavaScript is intentionally

17   scrambled or obfuscated.  Proctorio admits that language files contain messages in human

18   languages.[2]  Proctorio lacks knowledge or information to form a belief as to the truth of the

19   remaining allegations, and therefore denies them.

20        15.    Proctorio admits that Plaintiff published a "tweet thread" starting on

21   September 7, 2020.[3]  Proctorio admits that Plaintiff looked at Proctorio's source code.

22   Proctorio denies that the tweets which contain Proctorio's copyrighted material are related

23   to any legitimate criticism, or any actual critique of Proctorio at all, for that matter.

24   Proctorio denies that Plaintiff identified any contradiction between Proctorio's public

25   _____

26   [2] In response to the allegations in footnote 2, Proctorio admits that one purpose for
     language files can be to facilitate software use and adaptation in different locations and to
27   allow the software to display the appropriate natural language based on location.
     Proctorio denies that this is the sole purpose for language files.

28   [3] Proctorio admits the allegations in footnote 3.

CROWELL & MORING LLP
ATTORNEYS AT LAW

1  statements and the actual functionality of Proctorio's software.  Proctorio denies that

2  Plaintiff demonstrated the invasiveness of the Proctorio software, or illustrated a high level

3  of access that the software has to users' computers.  Proctorio otherwise lacks knowledge

4  or information to form a belief as to the truth of the remaining allegations, and therefore

5  denies them.

6          16.     Proctorio denies that Plaintiff included links to Proctorio's copyrighted

7  material in order to support any actual conclusions, let alone legitimate criticism.  Proctorio

8  admits that some of Plaintiff's tweets included links to Proctorio's copyrighted software

9  code that Plaintiff had uploaded onto a website called Pastebin.[4]  Proctorio lacks

10 knowledge or information to form a belief as to the truth of the remaining allegations, and

11 therefore denies them.

12         17.     Proctorio admits that Plaintiff published the statements in the relevant tweet

13 in Exhibit 1.  Proctorio denies that its software has any default metrics that are used to

14 determine a student's suspicion level; rather, those determinations are made solely by

15 individual schools and faculty members.  Proctorio denies that its software monitors any

16 examinees' activity with the *only* exception being in the event a university or faculty

17 member activates and enables such features and directs and controls the use of such

18 features.  Proctorio admits that Plaintiff linked to Proctorio's copyrighted material.

19 Proctorio admits that while its language file includes the phrase "eye movement," Proctorio

20 denies that its software has ever actually tracked eye movement.

21         18.     Proctorio admits that Plaintiff published the statements in the relevant tweet

22 in Exhibit 1.  Proctorio denies that its software compares different exam-takers to one

23 another using the metrics identified in Exhibit 3 (or any other metrics) absent direction and

24 control by the faculty member or school.

25         19.     Proctorio admits that Plaintiff published the statements in the relevant tweet

26 in Exhibit 1.  Proctorio denies that its software automatically terminates an exam for any

27

28 [4] Proctorio admits the allegations in footnote 4.

CROWELL & MORING LLP
ATTORNEYS AT LAW

1    reason.  Interruptions in internet connectivity for over two minutes may be one basis for

2    exam termination depending on how the settings are configured by the faculty member or

3    school, and plugging in an additional monitor could also be a basis for exam termination

4    depending on how the settings are configured by the faculty member or school.  Proctorio

5    admits that Plaintiff published the copyrighted source code at Exhibit 2.

6        20.    Proctorio admits that the quoted language appeared in Plaintiff's tweet.

7    Proctorio denies that its software conducts a room scan "if your suspicion level rises."

8    Rather, room scans are triggered according to a randomized algorithm that does not include

9    any consideration of suspicion levels, and only if the school has permitted, directed and

10   controlled this functionality to be in place.  Proctorio admits that Plaintiff included a

11   screenshot of a copyrighted video in the referenced tweet.

12       21.    Proctorio admits that Plaintiff's tortious activity continued over the next

13   week (and beyond), including Plaintiff posting tweets on September 11 containing a

14   Pastebin link to three lines of Proctorio's copyrighted software code.  Proctorio admits that

15   this code identifies highly sensitive information—a previously unpublished list of

16   programs that Proctorio blocks during testing sessions to prevent academic dishonesty—

17   and that its disclosure undermines the integrity of the test-taking process.  Proctorio denies

18   that it scrambles or obfuscates any of its code based on the plain meaning of the Google

19   store's terms of service, and Proctorio admits that the code at Exhibit 5 is also not

20   scrambled or obfuscated.  Proctorio lacks knowledge or information to form a belief as to

21   the truth of the remaining allegations, and therefore denies them.[5]

22           **B.    Fair Use**

23       22.    Proctorio admits that the so-called "Excerpts" and Video Screenshot

24   contained copyrightable (and, in fact, copyrighted) material.  Proctorio denies the

25   remaining allegations.

26

27   _____
     [5] In response to the allegations in footnote 5, Proctorio admits that sandboxing is a
     computer-security practice.  Proctorio denies that the tweet at Exhibit 5 either expressly or
28   implicitly makes any statements related to the security practice described in this footnote.

CROWELL & MORING LLP
ATTORNEYS AT LAW

23.     Proctorio admits that the fair use analysis includes four statutory factors that can be described in this way.  Proctorio denies that these are the only considerations in assessing whether or not a particular use of copyrighted material constitutes fair use.

24.     Proctorio denies these allegations.

25.     Proctorio denies these allegations.

26.     Proctorio denies these allegations.

27.     Proctorio denies these allegations.

### C.     Proctorio's Campaign of Harassment

28.     Proctorio admits that Plaintiff asked Proctorio's CEO (Mr. Mike Olsen) about the company's software over Twitter.  Proctorio admits that Mr. Olsen answered the question Plaintiff raised.  Proctorio denies that Mr. Olsen made any demands of any kind. Proctorio admits that Mr. Olsen informed Plaintiff that his use of Proctorio's copyrighted material also violated the company's terms of service and undermined the integrity of the test-taking process.  Proctorio admits that Plaintiff responded that there is "No TOS checkbox necessary to access" the company's copyrightable material, but denies the truth of this statement.  Proctorio admits that Plaintiff responded that anyone could find and uncover the copyrightable material, but denies the truth of this statement.  Proctorio otherwise lacks knowledge or information to form a belief as to the truth of the remaining allegations, and therefore denies them.

29.     Proctorio admits that its software's *automated* process banned Plaintiff's IP address based on activity that the software automatically associates with efforts to circumvent the software.  Proctorio denies that any Proctorio employee knew Plaintiff's IP address on September 7 or 8.  Unless there is a specific security or technical issue that requires the contrary, Proctorio employees do not know any test-taker IP addresses at any time, ever, unless the test-taker or school provides the information directly to Proctorio to allow Proctorio to unblock the IP address from its *automated* blocking processes.  Even more crucial here, because Proctorio employees did not know Plaintiff's IP address, there was no way that Proctorio employees could have purposefully blocked Plaintiff's IP

8

CROWELL & MORING LLP
ATTORNEYS AT LAW

address; Proctorio employees simply lack the ability and capability to do so. Proctorio denies that Plaintiff was forced to seek special accommodations after the automated ban occurred.[6] Proctorio otherwise lacks knowledge or information to form a belief as to the truth of any remaining allegations, and therefore denies them.

30.   Proctorio admits that on or around September 9, a representative from Miami University reached out to a Proctorio representative, and after being contacted by the school representative, the Proctorio representative inquired about whether Plaintiff's tweets were consistent with the school's behavior policies. Proctorio denies that, in its communications with Miami University, it failed to state that the tweets included the company's proprietary copyrighted material. Proctorio admits that the school representative informed it that the tweets could not be taken down based on the school's internal behavior policies. Proctorio otherwise lacks knowledge or information to form a belief as to the truth of any remaining allegations, and therefore denies them.

31.   Proctorio admits that Exhibit 7 indicates that Twitter sent an email to an email address that appears to belong to Plaintiff on October 19, which explains Twitter's decision to take down three of Plaintiff's tweets that linked to Proctorio's copyrighted material in response to a DMCA notice filed by Proctorio. Proctorio lacks knowledge or information to form a belief as to the truth of the remainder of these allegations, and therefore denies them.

32.   Proctorio admits that on or around September 28, 2020, Pastebin disabled access to Proctorio's copyrighted material, and that Pastebin issued a notice to that effect. Proctorio also admits that, on or around September 28, 2020, it submitted a DMCA notice to Pastebin. Proctorio otherwise lacks knowledge or information to form a belief as to the truth of these allegations, and therefore denies them.

33.   Proctorio admits that Plaintiff submitted a counternotice to Twitter on

---

[6] *See, e.g.*, Ex. B-3 at 4 (**Nov. 23, 2020 tweet**): "'We reached out to the school and offered to unban his IP address on September 9' . . . Who did they contact at the university? I have received no communication from my university on this matter. However, *even if my IP was unbanned from the software, I would not use it.*" (emphasis added).

9

1    October 30, 2020.  Proctorio otherwise lacks knowledge or information to form a belief as

2    to the truth of these allegations, and therefore denies them.

3         34.     Proctorio admits these allegations.  Specifically, as Exhibit 8 indicates,

4    Proctorio admits that after Pastebin had removed Plaintiff's infringing content from its

5    platform, Plaintiff decided to double down on his infringing conduct and "re-post the

6    information in them on another platform"—GitHub.

7         35.     Proctorio admits that it submitted a DMCA notice to GitHub, that GitHub

8    disabled access to Plaintiff's infringing material, that Plaintiff submitted a counternotice on

9    November 24, 2020, and that GitHub restored access on or around December 9, 2020.

10   Proctorio denies that its DMCA notice contained any false information.  Proctorio

11   otherwise lacks knowledge or information to form a belief as to the truth of these

12   allegations, and therefore denies them.

13        36.     Proctorio admits that its counsel informed Plaintiff's counsel that it had

14   submitted a second DMCA notice to Twitter.  Proctorio admits that its copyrighted code

15   was removed by Pastebin.  Proctorio otherwise lacks knowledge or information to form a

16   belief as to the truth of these allegations, and therefore denies them.

17        37.     Proctorio admits that its legal counsel participated in a phone call with

18   Plaintiff's legal counsel on November 30, 2020.  The substance of this phone call,

19   however, plainly consists of confidential "statement[s] made during compromise

20   negotiations about the claim," which Federal Rule of Evidence 408 clearly protects.

21   Therefore, Proctorio will neither admit nor deny any facts relating to the content of that

22   conversation between the parties' counsel.

23        38.     These allegations refer to confidential "statement[s] made during

24   compromise negotiations about the claim," which Federal Rule of Evidence 408 protects.

25   Therefore, Proctorio will neither admit nor deny any facts relating to the content of that

26   conversation between the parties' counsel.  Proctorio denies that its copyrighted code was

27   contained in unprotected files, and further denies that its copyrighted code could be read by

28   anyone who installed its software.

CROWELL & MORING LLP
ATTORNEYS AT LAW

39.    These allegations refer to confidential "statement[s] made during compromise negotiations about the claim," which Federal Rule of Evidence 408 plainly protects.  Therefore, Proctorio will neither admit nor deny any facts relating to the content of that conversation between the parties' counsel.  Proctorio denies that the copyrighted code that Plaintiff posted "represented only a miniscule portion" of its software code; rather, Plaintiff's posts contained highly-sensitive information that provided a roadmap for test-takers to circumvent all of Proctorio's software.

40.    These allegations refer to confidential "statement[s] made during compromise negotiations about the claim," which are protected by Federal Rule of Evidence 408.  Therefore, Proctorio will neither admit nor deny any facts relating to the content of that conversation between the parties' counsel.  Proctorio denies that Plaintiff infringed Proctorio's copyrights "specifically to support his critical commentary" (or even in conjunction with any critical commentary whatsoever), whether at the time of sending the DMCA notice to GitHub or the abuse claim to Pastebin, or at any other time that Plaintiff infringed Proctorio's copyrights.

41.    These allegations refer to confidential "statement[s] made during compromise negotiations about the claim," which Federal Rule of Evidence 408 plainly protects.  Therefore, Proctorio will neither admit nor deny any facts relating to the content of this e-mail communication between the parties' counsel, except to admit that this e-mail communication included in its subject line the words "Confidential" and "Subject to Rule 408."  Proctorio denies that its DMCA notices or abuse claim contained any inaccuracies. Proctorio admits that Plaintiff's posts on Twitter, Pastebin, and GitHub infringed Proctorio's copyrighted material.

42.    Proctorio lacks knowledge or information to form a belief as to the truth of these allegations, and therefore denies them.

43.    Proctorio denies that it has ever asserted an "improper copyright claim." Proctorio lacks knowledge or information to form a belief as to the truth of the remainder of these allegations, and therefore denies them.

CROWELL & MORING LLP
ATTORNEYS AT LAW

11

CROWELL & MORING LLP
ATTORNEYS AT LAW

**CLAIMS FOR RELIEF**

**Count 1**

**Declaratory Judgment of Noninfringement**

44.     Proctorio incorporates its responses to each and every allegation above as if fully set forth herein.

45.     Proctorio denies that there is a real and actual controversy as to whether Plaintiff used and infringed Proctorio's copyrighted material, as Plaintiff admits that he has used and infringed Proctorio's copyrighted material.  Proctorio admits that there is a real and actual controversy as to whether Plaintiff's use of the copyrighted material constitutes fair use.

46.     Proctorio admits that Plaintiff contends that his creation and use of the copyrighted material was consistent with the fair use doctrine.  Proctorio denies that Plaintiffs' creation and use of Proctorio's copyrighted material was consistent with the fair use doctrine.

47.     Proctorio denies these allegations.

48.     Proctorio admits that it has not withdrawn its DMCA requests or its abuse claims to take down Plaintiff's infringing content.  Proctorio admits, on information and belief, that Pastebin removed Plaintiff's infringing content posted on that platform based on the fact that Pastebin policies prohibit its users from posting another's source code, and not based on copyright, and that Pastebin has not restored Plaintiff's infringing posts.

49.     Proctorio admits that it continues to assert its legal rights, as protected by, *inter alia*, the First and Fifth Amendments to the U.S. Constitution.  Proctorio otherwise denies these allegations.

50.     Proctorio admits that Plaintiff has continued a months-long campaign to publicly disparage and misrepresent Proctorio, its officers, executives, employees, and its software.  Proctorio denies the remainder of these allegations.

51.     Proctorio denies these allegations.

12

**Count 2**

**Misrepresentation Under 17 U.S.C. § 512(f)**

52.     Proctorio incorporates its responses to each and every allegation above as if fully set forth herein.

53.     Proctorio denies these allegations.

54.     Proctorio denies these allegations.

55.     Proctorio denies these allegations.

56.     Proctorio denies these allegations.

## PRAYERS FOR RELIEF

Proctorio denies that Plaintiff is entitled to any relief whatsoever, specifically including the relief specified in its Prayers for Relief.

## PROCTORIO'S AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

FIRST AFFIRMATIVE DEFENSE TO EACH AND EVERY CAUSE OF ACTION

(**Failure to State a Claim**)

As a first and separate defense, solely by way of an affirmative defense and not to be construed as an admission, Proctorio alleges that, as to the first cause of action, Plaintiff has failed to prove that his use of the copyrighted material constitutes fair use. Each of the four statutory factors and the judicially established considerations that courts consider in regards to fair use analyses turn in favor of Proctorio and against Plaintiff. As to the second cause of action, Plaintiff has failed to meet any of the elements necessary to establish a claim under 17 U.S.C. § 512(f). This includes, though is not limited to, a failure to establish any misrepresentations made in relation to takedown notices, a failure to establish that Proctorio lacked a subjective good-faith belief that the takedown notices were proper, and a failure to establish either any injury or damages. Plaintiff is thus not entitled to any relief. This affirmative defense incorporates by reference each and every paragraph to this Answer and the Counterclaims that follow.

CROWELL & MORING LLP
ATTORNEYS AT LAW

13

SECOND AFFIRMATIVE DEFENSE TO EACH AND EVERY CAUSE OF ACTION

(**Unclean Hands**)

As a second and separate defense, solely by way of an affirmative defense and not to be construed as an admission, Proctorio alleges that, after engaging in a campaign of intentionally false statements impugning Proctorio, its products, and its senior executives, Plaintiff comes to this court with unclean hands to bring any claim premised on any alleged misrepresentations or any theory of fair use of the copyrighted material that he infringed. Plaintiff should therefore be barred from recovering the relief requested or any relief from Defendant. This affirmative defense incorporates by reference each and every paragraph to this Answer and the Counterclaims that follow.

THIRD AFFIRMATIVE DEFENSE TO EACH AND EVERY CAUSE OF ACTION

(**No Injury or Damages**)

As a third and separate defense, solely by way of an affirmative defense and not to be construed as an admission, Proctorio alleges that Plaintiff has not incurred any actual or present injury or damages as a direct and proximate result of Defendant's conduct. The copyrighted material that Proctorio sought to take down under the DMCA remain online on pages that Plaintiff controls and operates. To this end, he has suffered no injury or damages as a result and he is thus not entitled to any relief. This affirmative defense incorporates by reference each and every paragraph of this Answer and the Counterclaims that follow.

FOURTH AFFIRMATIVE DEFENSE TO THE SECOND CAUSE OF ACTION

(**Mootness**)

As a fourth and separate defense, solely by way of an affirmative defense and not to be construed as an admission, Proctorio alleges that Plaintiff's claims are barred, in whole or in part, by the doctrine of mootness. The copyrighted material that Proctorio sought to take down under the DMCA remains online on pages that Plaintiff controls and operates. To this end, any injury that he suffered is no longer present and no judicial action taken can change Plaintiff's state of affairs. Plaintiff is thus not entitled to any

CROWELL & MORING LLP
ATTORNEYS AT LAW

1  relief. This affirmative defense incorporates by reference each and every paragraph to this

2  Answer and the Counterclaims that follow.

3       FIFTH AFFIRMATIVE DEFENSE TO THE FIRST CAUSE OF ACTION

4       (**Plaintiff's Conduct is Administratively Improper and Lacks Ripeness**)

5       As a fifth and separate defense, solely by way of an affirmative defense and not to

6  be construed as an admission, Proctorio alleges that, as to the first cause of action,

7  Proctorio has filed DMCA takedown notices, and Plaintiff has filed counter-notices, the

8  effect of which has led to all of the material he has sought to publish remaining online.

9  There is no injury and no damages and the next step, as administratively dictated and

10  expected, is for Proctorio to file a suit, at which time Plaintiff can file a declaratory

11  judgment of non-infringement in response. This cause of action is accordingly improper

12  as dictated by the Copyright Act, and lacks ripeness.

13       SIXTH AFFIRMATIVE DEFENSE TO THE FIRST CAUSE OF ACTION

14       (**No Fair Use**)

15       As a sixth and separate defense, solely by way of an affirmative defense and not to

16  be construed as an admission, Proctorio alleges that, as to the first cause of action,

17  Plaintiff's use of Proctorio's materials is not primarily for the purposes of criticism and

18  commentary. Rather, Plaintiff made clear that his primary purposes for publishing this

19  material is to destroy the market for Proctorio's copyrighted material, destroy Proctorio's

20  actual or prospective business relationships and to "abolish online proctoring." Plaintiff's

21  use of Proctorio's materials is for the purpose of furthering false and misleading

22  statements, which he has made in bad faith. As a self-described "Security & Privacy

23  Researcher" (*see* Ex. B), Plaintiff has profited from his infringing conduct by, *inter alia*,

24  attention, recognition, and notoriety that resulted from his publication of Proctorio's

25  copyrighted material. Even if Plaintiff's primary purpose of posting this material was for

26  the purposes of criticism or commentary—which it was not—Plaintiff's use of Proctorio's

27  protected material was not of reasonable length to accomplish any goals of criticism or

28  commentary. Plaintiff has used a quantitatively and qualitatively substantial part of

CROWELL & MORING LLP
ATTORNEYS AT LAW

15

1    Proctorio's copyrighted material, all of which is highly creative.  Plaintiff's use of

2    Proctorio's copyrighted material has significant effect on the market (and potential

3    market) for and value (and potential value of) those materials.  This affirmative defense

4    incorporates by reference each and every paragraph to this Answer and the Counterclaims

5    that follow.

6    <u>SEVENTH AFFIRMATIVE DEFENSE TO THE SECOND CAUSE OF ACTION</u>

7    (**Proctorio's Conduct is Constitutionally Protected**)

8    As a seventh and separate defense, solely by way of an affirmative defense and not

9    to be construed as an admission, Proctorio alleges that Plaintiff's claims are barred, in

10   whole or in part, because any or all of Defendant's conduct at issue in Plaintiff's

11   allegations is constitutionally protected.  Proctorio is entitled under, *inter alia*, the First

12   and Fifth Amendments to protect its intellectual property interests and to avail itself of any

13   and all administrative, judicial, or legal processes to that end, including but not limited to

14   those processes established in the DMCA.  Plaintiff is thus not entitled to any relief.  This

15   affirmative defense incorporates by reference each and every paragraph to this Answer

16   and the Counterclaims that follow.

17

18   **RESERVATION OF DEFENSES**

19   Proctorio reserves all rights to plead any additional, separate defenses, the

20   availability of which may come to light as the action proceeds.  Further, Proctorio

21   reserves all rights to withdraw any defenses it may subsequently determine to be

22   inapplicable.  Nothing in the foregoing defenses constitutes a concession that Proctorio

23   bears any burden of proof on any issue on which it would not otherwise bear such a

24   burden.

25

26

27

28

CROWELL & MORING LLP
ATTORNEYS AT LAW

16

## PROCTORIO'S FIRST AMENDED COUNTERCLAIMS AGAINST PLAINTIFF

1.      Every American deserves access to higher education.  Responsibilities such as child care, working multiple jobs to help pay for higher education, or caring for an elderly parent should not deny aspiring students access to the classroom.  Nor should having a disability, living far from campus, or public health crises such as the COVID-19 global pandemic.

2.      And that education must be meaningful.  A degree is worthless if it is not trusted.  Higher education can open doors to new opportunities and progress, but only if employers and graduate schools are confident that a degree represents an individual's legitimate experience and academic training.

3.      A meaningful, legitimate education is essential for a robust, reliable economy.  We trust bridges because they are designed by engineers with certifications and licenses only conferred after years of training and intensive competency exams.  We send our children to pediatricians because we know doctors cannot practice unless they pass the boards.  We entrust accountants with our retirement funds and lawyers with our IOLTA accounts because those professionals must take and pass a set of rigorous exams and adhere to ethical codes to participate in those professions.  Reliable test results are necessary for this trust to exist.

4.      Proctorio CEO Mike Olsen understands this.  He founded Proctorio in 2013, recognizing there was an expanding need to protect exam integrity in online or distance learning environments.  Most other remote proctoring solutions rely on the schedules of outsourced proctors or force test takers to register for their exams outside of their institution's assessment platforms.  But Mike Olsen understood that was not necessary.  Through Proctorio, he sought to modernize higher education and expand access to degrees that the public can trust, breaking down barriers to remote education.

5.      Proctorio licenses software that protects the integrity of examinations—*i.e.*, the software helps schools and faculty offer remote instruction while also identifying potential academic dishonesty during exams.  The product has three main functions.  First,

it helps confirm a test-taker's identity, because it goes to the heart of exam integrity to ensure that the person receiving the grade for the exam is the same individual who is actually taking the exam. Second, Proctorio software helps determine if a test-taker is referring to prohibited content or consulting other people during an exam, because if one test-taker has an unfair advantage, it harms the integrity of the entire exam. Last, Proctorio can block certain programs on a test-taker's computer (*e.g.*, web browsers, e-mail programs), to ensure test-takers are all taking the exam from the same starting point.

6.      No software is perfect. Remote test-proctoring software is still a new technology. While it has grown in popularity, the COVID-19 global pandemic changed everything. In a very short period of time, thousands of schools and millions of students who had never used remote proctoring technology immediately needed this software to keep classes open. This shift led to a groundswell of violations of exam integrity,[7] but also increased scrutiny of the software platforms trying to prevent it. That scrutiny is absolutely a good thing, and Proctorio welcomes constructive criticism aimed at improving its product. But bad faith allegations and false accusations attacking Proctorio and its CEO Mike Olsen in violation of the law are a different matter altogether.

7.      Erik Johnson, a Miami University-Oxford undergraduate student, is one of the voices raising concerns about remote proctoring software like Proctorio's. For example, on September 7, 2020, Mr. Johnson suggested on Twitter that Proctorio should soften the language in the pop-up notifications that test-takers see during stressful exams. *See* Ex. B-3 at 31.[8] A few days later on September 11, 2020, Mr. Johnson raised awareness about a university professor who was using Proctorio's software improperly. *See id.* at 28.

---

[7] *See, e.g.*, Tawnell D. Hobbs, *Cheating at School Is Easier Than Ever—and It's Rampant*, WALL ST. J. (May 12, 2021), *available at* https://www.wsj.com/articles/cheating-at-school-is-easier-than-everand-its-rampant-11620828004?mod=e2tw (last viewed June 25, 2021) (attached as Ex. A).

[8] Exhibit B is in three parts due to size, and citations refer to Exs. B-1, B-2, and B-3. Also, Exhibit B displays the tweets in Greenwich Mean Time (GMT), while Proctorio has sought to reflect the dates and times for this Counterclaim in Pacific Standard Time (PST) for consistency's sake, as Johnson reflected dates/times in PST as well.

CROWELL & MORING LLP
ATTORNEYS AT LAW

CROWELL & MORING LLP
ATTORNEYS AT LAW

1  Others have raised concerns that Proctorio's software may unfairly impact students with

2  disabilities and racially-diverse students.  *See* Ex. C.

3      8.      Proctorio's leadership heard this constructive feedback, and has taken swift

4  action to address it.  The company tempered the language in its pop-up notifications to

5  better protect student morale during examinations.  The company has developed an

6  acceptable use policy for faculty so that it can ban professors who abuse the platform.  And

7  to confront the issues faced by students with disabilities, Proctorio has partnered with My

8  Blind Spot, a consulting firm that helps improve digital infrastructure to make it more

9  accessible and inclusive to people with disabilities.  Likewise, to make its platform as

10  inclusive as possible, Proctorio has commissioned a top-to-bottom audit of its algorithm

11  from BABL AI, a firm that specializes in evaluating algorithms for bias and issuing

12  recommendations to improve the platform.

13      9.      But good-faith criticism of Proctorio and its product are not the subject of

14  these counterclaims ("Counterclaims").  Proctorio welcomes good-faith criticism from Mr.

15  Johnson or anyone else, as long as such is within the bounds of the law, and the company

16  has a proven track-record of responding to real concerns.

17      10.     The problem is that many of Mr. Johnson's statements about Proctorio

18  have, unfortunately, not been made in good faith and are false or misleading.  In fact, since

19  September 2020, Mr. Johnson has consistently published statements about Proctorio that he

20  either knows are false or misleading, or that he has made with a reckless disregard of their

21  falsity or misleading nature.

22      11.     Mr. Johnson has stated that Proctorio secretly invades students' local

23  computers and, after entering the computer, can both spy on and obtain sensitive data from

24  students without their knowledge or consent.  **False.**  Mr. Johnson allegedly investigated

25  Proctorio language files and source code to make this claim.  He does not explain how this

26  software possibly elucidates this conclusion, or how any of Proctorio's software allows the

27  company to surreptitiously invade student computers.  This is because his accusations are

28  false, are not based on software analysis, and reflect a lack of understanding of how the

code operates.

12.    Mr. Johnson has stated that Proctorio "obfuscates" its code to hide the functionality and, in doing so, violates the Google Chrome Store terms of service. **False.** Software developers understand the difference between "obfuscation" and the concept of "minification," where the latter is a common, run-of-the-mill process to remove unnecessary characters to ensure more efficient code transmission. Google understands the distinction, which is why its Chrome Store terms of service expressly permit minification, while banning obfuscation. Minification is all that Proctorio has done with its code. Mr. Johnson has accused Proctorio of obfuscation with either a knowing or reckless disregard for the falsity of his claims.

13.    Mr. Johnson has stated that Proctorio leaves student data highly vulnerable to theft and disclosure and that the company lies about its data-protection efforts. **False.** Proctorio has state-of-the-art data protection mechanisms in place and regularly updates its technology to protect student data. The data protection is so strong that not even Proctorio can access student information. Indeed, Proctorio takes this public commitment so seriously that it has engaged consultants at a highly-regarded security consulting firm *specifically* to validate an extra layer of encryption key security to make doubly sure that Proctorio cannot access student data. Mr. Johnson both ignores these facts and accuses Proctorio of lying about these data protection efforts, all while falsely impugning Proctorio as a "Teenage Lap Cam."

14.    And Mr. Johnson has stated that Proctorio makes determinations as to whether students are flagged for academic dishonesty. **False.** Only schools and faculty can make those decisions. Mr. Johnson knows this from (1) taking classes that use Proctorio software, (2) his position on the university subcommittee investigating remote proctoring software, and (3) his review of the company website and a letter Proctorio sent to the United States Senate.

CROWELL & MORING LLP
ATTORNEYS AT LAW

15.     Indeed, Mr. Johnson's university dispels his allegations on the very webpage from which it directs students to download Proctorio to use in exams.[9]  Under the prominent header "Privacy and Data Security," Miami University-Oxford debunks in plain English all of Mr. Johnson's false claims:

**Privacy and Data Security**

Proctorio is a third-party remote proctoring tool adopted by Miami University. Proctorio is browser-based and requires an extension to be installed on Chrome. The goal of using Proctorio is to encourage honest work and maintain high standards of integrity and for both instructors and students to have confidence in the overall integrity of the assessment. The use of Proctorio, is first and foremost, meant to serve as a reminder that remote assessments are treated in the same manner they would in face-to-face assessments.

Depending on the settings controlled by individual instructors, students' browsers and/or tabs may be locked down, and students' webcam, computer screen, sound, web traffic, Miami IDs, and room environment may be recorded. Proctorio only runs during the exam period. After finishing the exam, students may choose to uninstall the Proctorio extension, and just reinstall it before the next exam. Additionally, Proctorio does not watch student exams live, unless the student requests live support during the exam.

Privacy provisions have been established to ensure student privacy and FERPA compliance. According to Proctorio's policies and terms of agreement, we are of the understanding that Proctorio has zero access to the encrypted data on their own servers. Data are transferred and stored with zero-knowledge encryption and can only be accessed by course instructors and authorized university officials.

16.     In short, Mr. Johnson's public statements are not good-faith criticisms about a new technology, much less "criticisms" at all.  They do not represent a legitimate effort to raise awareness about real concerns with the software.  They cannot even be called confused misstatements about how the software operates.  With these statements, Mr. Johnson is publishing statements he knows are false.  He is not a "white hat" hacker with aims to help improve data security.  His aim is not to improve Proctorio, but instead to not have Proctorio at all.[10]

17.     Nor are Mr. Johnson's statements mere opinions, even though he may himself be frustrated with virtual learning.[11]  Mr. Johnson refers to himself as a "security

---

[9] *See* "Proctorio for Students," MIAMI UNIV. (last viewed June 30, 2021), *available at* https://www.miamioh.edu/online/resources/proctorio-for-students/index.html.

[10] For example, four weeks after filing this case, Mr. Johnson re-tweeted a call to "Abolish online proctoring."  *See, e.g.*, Ex. D; *see also* Ex. E ("We need to ban remote proctoring right now.").

[11] *See* Ex. A (quoting Plaintiff: "Erik Johnson, an 18-year-old freshman at Miami University in Oxford, Ohio . . . said he knows students who have used homework help sites for studying—and for cheating.  He said he hasn't cheated himself.  He said students, including himself, are frustrated with virtual learning because there's less interaction with instructors and it's not as structured.  'I haven't struggled this way with learning material, ever,' he said. 'It's just really difficult to learn and retain the information just exclusively at your own pace.'").

CROWELL & MORING LLP
ATTORNEYS AT LAW

1  researcher" (Compl. ¶ 11).[12]  He published these false statements after he claimed to have

2  conducted an "investigation of the software code" (*id.* ¶ 15).  His Complaint fully

3  acknowledges that his tortious tweets sought "to report his findings from his investigation

4  of the Proctorio Software and to provide evidence supporting his assertions."  *Id.* ¶ 24.

5  "Findings" and "evidence"—not "opinions."

6       18.     Mr. Johnson's falsities have travelled far and wide.  He has intentionally

7  directed them towards both the general public and also towards specific universities and

8  faculty members.  He has primarily published them over Twitter, but has also published his

9  false and misleading statements, in national, state, and local fora.

10       19.     Though Mr. Johnson published his false statements in cyberspace, they

11  have real-world consequences.  Among Proctorio's university clients, they raise unfounded

12  concern about the legitimacy and security of Proctorio's product—unfounded concerns that

13  Proctorio's clients and prospective clients have raised in subsequent negotiations.  They

14  unlawfully defame Proctorio's executives.[13]  They unfairly cast doubt on the reliability of

15  Proctorio's statements regarding its product, and they have caused Proctorio concrete

16  commercial injuries.  These consequences are, in fact, exactly what Mr. Johnson appears to

17  want.  Specifically, on several occasions, Mr. Johnson has expressed pure joy over

18  institutions boycotting Proctorio's products over the same unfounded and false "concerns"

19  he has raised, including:

20       a.    **January 28, 2021 re-tweet:** lauding University of Illinois' decision to

---

[12] *See also* Ex. B-1 at 3, which reflects Mr. Johnson's Twitter profile, on which he describes himself as a "Security & Privacy Researcher."

[13] For instance, in two March 3 tweets, Mr. Johnson twice re-tweeted a black-and-white mugshot-style picture of Mike Olsen, who is described as Proctorio's "creepy CEO," and suggested that Mr. Olsen had developed a "Teenage Lap Cam."  *See* Ex. F (**Mar. 3, 2021 re-tweets**).  Mr. Johnson likewise shared an article published on the webpage of an organization called "Fight for the Future"—which, on information and belief, Mr. Johnson and those closely connected to him, including, on information and belief, at least one member of his immediate family, are affiliated with—which falsely described Proctorio's technology as "literally mak[ing] young people film themselves for a spyware app" and suggested Proctorio sent its DMCA notices because "Mike [Olsen] was SO bummed that Erik [Johnson] would dare to interrupt Mike's filming of teenage laps."  *See* Ex. G.  The disgusting—and legally unacceptable—implication of these Tweets was apparent.

22

CROWELL & MORING LLP
ATTORNEYS AT LAW

apparently stop using Proctorio and re-tweeting the message "1 down, over a thousand universities and colleges to go. In 2021, Proctorio will pay." *See* Ex. H.

b. **April 19, 2021 tweet:** lauding University of Warwick Business School's cancelling a Proctorio trial following a student petition against the use of Proctorio. Ex. I.

c. **March 18, 2021 tweet:** lauding the University of British Columbia's apparent decision to ban the use of Proctorio software and tweeting at Miami University and its president Jason Osborne urging "It's time for other institutions to do the same. I'm looking at you, Miami." Ex. B-1 at 17.

d. **February 20, 2021 tweet:** lauding the Online Teaching Conference withdrawing its agreement with Proctorio to sponsor the event. Ex. B-2 at 7.

Proctorio has been left with no choice but to respond to the false and misleading statements which have been intentionally made to harm its business.[14]

20.     In addition, Mr. Johnson has broken contractual promises intended to benefit Proctorio and has purposefully and repeatedly infringed Proctorio's copyrights.

21.     To use Proctorio and to download its software, Mr. Johnson agreed not to access and disclose the company's copyrighted software platform and services. He made this promise with Miami University-Oxford expressly to protect Proctorio's interests.

22.     Nonetheless, Mr. Johnson violated this agreement when he accessed and then disclosed the language files and source code that underlies the Proctorio product. Even more troubling, Mr. Johnson did this with knowledge that the source code he was disclosing would allow students to circumvent the technology to cheat on exams. In other words, Mr. Johnson *not only* violated his promise to protect Proctorio's technology he *also*

[14] Before this lawsuit, Proctorio tried to find ways to positively address any problems that Mr. Johnson has with the company. In addition to efforts to communicate with Mr. Johnson and to provide answers to his questions, Proctorio has even sent him and his associates, at Mr. Johnson's request, Proctorio t-shirts bearing the company's name and logo in a goodwill gesture.

1   took steps that he _knew_ would substantially undermine the product's efficacy.

2        23.     And Mr. Johnson's use of Proctorio's copyrighted materials fares no better.

3   His publishing of Proctorio's language files, source code, and user interface provide

4   absolutely no value to his purported criticism about the company.  The disclosures do not

5   add greater clarity, understanding, or depth to the criticism.  They do not reinforce or

6   better-articulate his criticism.  They do not help the reader understand the criticism in a

7   new light or otherwise benefit the criticism in any fashion.  All that the disclosures of

8   Proctorio's copyrighted material do is make it easier for others to circumvent the product,

9   cheat on exams, wrongfully further the false and misleading statements, and ultimately

10  destroy the market for the very same copyrighted material.

11       24.     Proctorio cannot simply stand by as an individual deliberately and

12  wrongfully attempts to undermine the value and efficacy of a security product into which

13  Proctorio—and its university clients—have invested so much.  Mr. Johnson is infringing

14  Proctorio's copyrights, violating the terms of his agreement with Proctorio, and making

15  false and misleading statements about its product.

16       25.     For these reasons, and to protect its legal rights in the face of an unchecked

17  campaign of falsehoods, Proctorio regrettably must bring these Counterclaims.

18                     **PARTIES**

19       26.     Defendant / Counterclaimant Proctorio, Inc. is a Delaware corporation with

20  its principal place of business in Scottsdale, Arizona.

21       27.     Plaintiff / Counterdefendant Erik Johnson is an undergraduate student at

22  Miami University in Oxford, Ohio, who on information and belief is domiciled in

23  Libertyville, Illinois.

24               **JURISDICTION AND VENUE**

25       28.     Based on the allegations in Counterdefendant's complaint filed in this

26  action ("Complaint"), there presently exists a justiciable controversy.

27       29.     This Court has subject matter jurisdiction over the Counterclaims pursuant

28  to 28 U.S.C. § 1331, and 1338(a), and because some claims arise under the Copyright Act

CROWELL & MORING LLP
ATTORNEYS AT LAW

24

17 U.S.C. § 101 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

30.     This Court also has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the statutory minimum, and Counterdefendant is diverse with Counterclaimant.

31.     This Court has personal jurisdiction over Counterdefendant because, *inter alia*, Counterdefendant filed suit in this district.

32.     Venue is proper in this judicial district under 28 U.S.C. § 1391 and/or 1400 at least because Counterdefendant has filed the Complaint in this District.

33.     Pursuant to 28 U.S.C. § 1367(a), the Court has supplemental subject-matter jurisdiction over Proctorio's state-law claims because these claims are so related to the copyright claims herein that they form part of the same case or controversy.

## GENERAL ALLEGATIONS
### Proctorio's Remote Exam Proctoring Software Is a Widely Adopted Product That Significantly Expands Access to Higher Education

34.     Hundreds of colleges and universities in the United States have chosen to license Proctorio's software to expand secure remote access to higher education. Many of the nation's most well-respected higher educational institutions trust Proctorio to protect academic integrity for distance learners across the globe.

35.     The need for Proctorio intensified once the global COVID-19 pandemic closed the door to in-person exams. But Proctorio had already been on the steady rise, having grown substantially between its founding in 2013 and 2019.

36.     Schools have widely adopted Proctorio because it is effective, flexible, and easy to use. It is a fully-automated platform that offers features that allow schools and faculty—not Proctorio—to make exam integrity decisions. This significantly lowers the time and cost associated with ensuring exam integrity, and also allows students to take exams from anywhere with confidence that the results can be trusted.

37.     Proctorio's software lets schools decide from a menu of institution-wide settings that assist in flagging data for a faculty member's review that may indicate activity

CROWELL & MORING LLP
ATTORNEYS AT LAW

1   that (in the opinion of the faculty member) evinces academic dishonesty. For any

2   particular exam, the faculty member must decide which settings to turn on. The software

3   documents the activity associated with the relevant settings and provides a report that aids

4   the school in reviewing the raw underlying data collected by Proctorio. The school and

5   faculty—not Proctorio—may then determine for themselves whether the exam was

6   completed consistent with the school's policies.

7           38.     These points bear emphasizing. First, **Proctorio does not decide what**

8   **data is collected.** It offers software features that a school can license, and that a faculty

9   member can then decide to turn on or off for any particular exam. Second, **Proctorio does**

10  **not analyze any student data.** It collects data at the school's and faculty's direction and

11  control, and then automatically prepares a report that the school and faculty can review.

12  And third, **Proctorio does not decide what behavior is flagged as potentially**

13  **inconsistent with exam policies.** A student's school and faculty make all of these

14  decisions.

15          39.     Proctorio also does not hide its product functionality. In fact, before every

16  exam, the student must affirmatively consent to using the Proctorio software, and is told

17  what exam-integrity features chosen by her university will be in place during the exam.

18          40.     As already noted, these features have three basic functions: (1) to confirm

19  the examinee's identity; (2) to determine whether the examinee is relying on prohibited

20  content or third-parties; and (3) to block certain programs on an examinee's computer.

21          41.     For the first function, Proctorio asks the examinee to hold up a photo

22  identification card. Either a school administrator or the faculty member can compare the

23  ID card to the examinee's image after the exam, or a Proctorio agent can make the

24  comparison in real-time if the university requests that service.

25          42.     For the second function, Proctorio collects and then automatically generates

26  a report describing whether an examinee relied on extra-exam materials. If the university

27  chooses to enable it, the platform can collect examinee video, and then can automatically

28  mark where in the video the examinee looks away from the screen, or where a second face

CROWELL & MORING LLP
ATTORNEYS AT LAW

26

CROWELL & MORING LLP
ATTORNEYS AT LAW

1   shows up.  It can collect exam audio, and then can mark where the sound is loud enough to

2   suggest that the examinee spoke to another person during the exam.  And it can collect

3   screen or website activity, and then can auto-generate a list of websites visited during the

4   exam.  Again, this can all occur automatically if the school or faculty select that option, or

5   the school and faculty can choose features where Proctorio agents conduct a first-level

6   review when potential issues arise.

7       43.     And for the third function, Proctorio blocks access to device functionalities

8   which may enable academic dishonesty.  For example, Proctorio can stop examinees from

9   using virtual machines during the exam, which can allow third-parties to take exams from

10  different locations.  Proctorio can also require examinees to use a full screen or only one

11  screen; can disable new tabs and close open tabs; can disable printing, the clipboard, and

12  right-click functionality; and can clear the cache and prevent exam re-entry.  Universities

13  and faculty can change, enable, or disable any of these features.

14      44.     Each of these features operate within a heavily protected environment that

15  ensures the examinee's personal information is secure from breach and exposure beyond its

16  limited purpose to protect exam integrity.  **Biometrics are <u>never</u> collected by the**

17  **company.**  Proctorio does not use biometric analysis like facial recognition, keystroke

18  fingerprinting, or voice recognition.  All data used to support live proctoring and

19  verification functions are immediately deleted.  And all other data is preserved solely at the

20  school's direction, and only after informing the student of how, where, and for how long

21  the data will be stored.

22      45.     Proctorio's data encryption efforts are state-of-the-art.  Proctorio secures

23  and processes examinee data through multiple layers of encryption.  Transmission from the

24  examinee's device to Proctorio data centers happens over TLS 1.2 or 1.3 and, if the

25  browser supports it, Perfect Forward Secrecy ("PFS").  Data temporarily stored in

26  Proctorio's data center is encrypted using AES-256 and is protected with FIPS 140-2

27  compliance.  All data centers are SOC 2 attested.  The company's browser extension uses

28  an encryption layer secured with AES-GCM.  And the platform undergoes daily

27

1  vulnerability and penetration tests to help mitigate the risk of a data security incident.

2        46.      Moreover, when Proctorio publicizes that it has "zero-knowledge

3  encryption," it means that the company does not have encryption keys to decrypt any audio

4  or video data. Records can **only** be accessed by the faculty or school, or by Proctorio

5  agents under the direction and control of the faculty and school. This bears repeating: it is

6  **impossible** for Proctorio to access any student data without first being given access to that

7  information affirmatively from the school or the student. Proctorio's access is completely

8  directed and controlled by the school, always revocable by the school, and – in fact –

9  extremely rare. For example, the only situations where Proctorio might even be granted

10  limited access is in a troubleshooting instance (but even then, Proctorio's typical practice is

11  to request a screen share) or with the professional review functionality (which has been

12  used in approximately 0.0005% of all exams taken with the software).

13        47.      Moreover, Proctorio recognizes that the data security environment is

14  dynamic, and takes a proactive approach against security and privacy threats. In mid-2020,

15  Proctorio engaged a leading information security consulting company to perform security

16  assessments of its software and cloud environment. Proctorio recently achieved ISO 27001

17  certification,[15] and it successfully completed a SOC 2 Type 1 audit.[16] All of these data

18  protection audits are *voluntary*; Proctorio takes these steps to protect its users.

19        48.      And finally, the Proctorio agents who support the live product features are

20  heavily vetted. Each is a company employee. And each employee receives a background

21  check and five weeks of training before taking any live proctoring or verification

22  assignment. In no situation may the employee obtain or use the data reviewed for exam

23  purposes outside of the narrow direction provided by the school.

---

[15] *See* "Proctorio achieves ISO 27001:2013 Information Security Certification" (June 25, 2021) *available at* https://blog.proctorio.com/proctorio-achieves-iso-270012013-information-security-certification/.

[16] *See* "Proctorio Becomes SOC 2 Type 1 Compliant Proctoring Provider" (Apr. 14, 2021), *available at* https://blog.proctorio.com/proctorio-becomes-soc-2-type-1-compliant-proctoring-provider/.

CROWELL & MORING LLP
ATTORNEYS AT LAW

1

## Mr. Johnson's Knowledge About Proctorio & Its Product

2   49.   Mr. Johnson knows all of this. Everything described above about Proctorio

3   and its product is publicly available, and Mr. Johnson had acknowledged that he has read

4   and reviewed this same information. Indeed, every single time since September 2020 that

5   Mr. Olsen has tweeted about Proctorio, Mr. Johnson has tweeted a response. Mr.

6   Johnson's focused attention on Proctorio and all of the company's activities over the past

7   ten months strongly indicate that he is aware of the actual facts. *See, e.g.*, Ex. B

8   ("Proctorio" appears in Mr. Johnson's tweets 263 times since September 2020).

9   50.   Mr. Johnson states that he has attended classes that use Proctorio, and that

10  his classmates have taken exams with the software. (Compl. ¶¶ 11-12). He also admits

11  that he downloaded the software onto his local computer. (*Id*. ¶ 14). Mr. Johnson thus

12  knows or should know that the company informs students upon downloading the software

13  and prior to using the software what data is collected and how it is stored. And he thus also

14  knows or should know that his school and faculty decide what data is collected, where the

15  information is stored, the data securities measures in place, and for how long data is

16  retained.

17  51.   Mr. Johnson has reviewed Proctorio's material about the software. He

18  admits to reviewing the website (Compl. at Ex. 6[17]) and the company's software-as-a-

19  service ("SaaS") agreements. (Ex. B-2 at 16-17). He admits to reviewing the private

20  contracts that Proctorio enters with colleges and universities, which he obtained via

21  freedom-of-information requests. (*Id*. at 28-29). And he admits to reviewing the twenty-

22  two-page letter that Proctorio prepared in response to an inquiry from six United States

23  Senators investigating the remote test proctoring industry. (*Id*. at 22[18]); *see also* Ex. J.

24  Having reviewed these abundant materials, Mr. Johnson knows or should know all of the

25  _____

26  [17] This Exhibit discloses a conversation in which Mr. Olsen sends Mr. Johnson a link to Proctorio's website, and Mr. Johnson responds that the website is "clarifying" and "address[es his] concerns." Compl. at Ex. 6.

27  [18] The third link in the tweet from John Davisson links to Proctorio's Senate Response.

28

CROWELL & MORING LLP
ATTORNEYS AT LAW

CROWELL & MORING LLP
ATTORNEYS AT LAW

actual facts about Proctorio described herein. But in particular, he knows or should know the types of information the company collects and does not collect from examinees and the security measures the company uses to protect examinee information.[19]

52.     Mr. Johnson has researched the software with his peers. The Complaint notes that Johnson is on a university subcommittee "tasked with investigating whether or not the use of remote proctoring services such as Proctorio is in line with his university's values." (Compl. ¶ 13). At least on the basis of this description, Mr. Johnson knows or should know from his participation on the subcommittee that Proctorio makes no decisions regarding what integrity features are available or when they are used, and that Proctorio does not determine what constitutes academic dishonesty. Universities and teachers make those calls. Moreover, Mr. Johnson has remained in both close and active connection with others who oppose proctoring technology and seek to abolish it.[20]

53.     And Mr. Johnson has researched the software on his own. In violation of his promises to Proctorio, Mr. Johnson accessed the Proctorio software code that is stored in hidden folders upon download, and has both reviewed this material and published it on the Internet. (*Id.* ¶ 14). Under the guise of software research, he admits to reviewing the software to determine the data privacy features the company has in place and whether there are any vulnerabilities that can put student information at risk. (Ex. B-3 at 16). For these reasons, Mr. Johnson knows or should know that Proctorio does not obfuscate its software,

---

[19] For example, Proctorio's website has a privacy policy, a terms of service agreement, and a Frequently Asked Questions page. *See* Proctorio | Privacy and Cookies, *available at* https://proctorio.com/privacy-policy; Proctorio | Terms of Service, *available at* https://proctorio.com/terms; Proctorio | FAQ, *available at* https://proctorio.com/faq (all last viewed June 25, 2021). These publications together describe the security measures Proctorio takes and the information the company collects. Even more to the point, Proctorio's Senate response letter has a detailed description of each type of information the company collects, *see* Ex. J at 4-10, and how it is secured, *id.* at 18-19.

[20] In particular, Mr. Johnson has remained in close and active contact with Ian Linkletter, who has also unlawfully disclosed Proctorio's proprietary content. Mr. Johnson has retweeted and supported Mr. Linkletter to help him evade a restraining order, *see* Ex. B-2 at 37) and make misleading statements about Proctorio's technology, *see id.* at 30. Mr. Johnson is also in contact with others who oppose Proctorio's software and have made disparaging statements about the company and its technology through online blogging.

that Proctorio has no possible way to surreptitiously invade student computers and access sensitive information, and that Proctorio does not even have the technical ability to see, collect, transmit, or in any way manipulate student information. Any good-faith research into the product would make these actual facts abundantly clear.

### Mr. Johnson Has Made Numerous False Public Statements About Proctorio & Its Product with Knowledge or Reckless Disregard of Falsity of Those Statements

54. Unfortunately, Mr. Johnson's knowledge about Proctorio has not stopped him from making false public statements about the company and its product. Indeed, Mr. Johnson has made and amplified each of his statements either knowing that they are false or with a reckless disregard of their falsity.

55. Many false statements were made on September 7 and 11, 2020. (*See id*. at 25-31). But importantly, Mr. Johnson repeated and amplified these statements on at least three occasions. First, on September 14, 2020. (*See id*. at 23-24). Second, on October 23, 2020—when he expressly referred to the statements as his "research into the platform." (*Id*. at 15). And third, when he "pinned" the October 23 statement to the top of his Twitter homepage. (Ex. B-1 at 2). By pinning the October 23 statement, Mr. Johnson ensured that his false and misleading "research into the platform" would be the first statements that visitors see.

56. This initial set of false statements fall into three categories. First, false statements about Proctorio's security and privacy features. These include, but are not limited to, Mr. Johnson's published statements that:

    a. "Proctorio seemingly routes ALL of your chrome browsing traffic through their servers and hides it from any tools" and that the software "ALWAYS does this if it's installed." (*See* Ex. B-3 at 30).

    b. "It's seemingly impossible to tell when the proctorio [*sic*] extension is collecting data from your browser and when it's not" and that Proctorio "has all permissions whenever installed and could be logging data 24/7." (*Id*.)

    c. "[I]f you open Charles/Burp with the proctorio [*sic*] extension installed, you

CROWELL & MORING LLP
ATTORNEYS AT LAW

won't see ANY of your network traffic from chrome [*sic*]. I can't see where
it's sending data because no DevTools." (*Id*.)

    d.   Proctorio employees "will spy on you" "if you raise enough flags to the
algorithm during the exam" and that they "have full access to the feed of
students' exams." (*Id*. at 32).

Mr. Johnson's intent in making these statements was to create doubt and distrust in
Proctorio's data privacy and security features. Yet, for the reasons described above, Mr.
Johnson knows that these statements are false.

    57.    The second category is false statements about Proctorio's ability to make
platform decisions that impact students taking exams. These include, but are not limited to,
Mr. Johnson's public statements that:

    a.   "Proctorio looks for & flags" student activity during exams. (*Id*. at 31-32).

    b.   Proctorio "use[s] these metrics to compare you to other students in the
class." (*Id*. at 31).

    c.   Proctorio "forc[es] a student to have a private quiet room with a quality
webcam, microphone, and stable internet connection." (*Id*. at 29).

The intent of these statements was to pin blame onto Proctorio for the use of the software
despite knowing that solely universities and faculty members—not Proctorio—make these
decisions and control their use of the software.

    58.    The final category includes false or misleading statements that Mr. Johnson
supported by publishing Proctorio's copyrighted material. Indeed, every time Mr. Johnson
published Proctorio's copyrighted content, he did so in furtherance of a claim that he either
knew was false or that he made in reckless disregard of its falsity.

    a.   **The "list of metrics" tweet (Ex. B-3 at 31-32):** Misleading the public
about the Proctorio product's functionality, on September 7, 2020, Mr.
Johnson published an incomplete and misleading list of activities that the
software can flag if the school or faculty selects that option and the behavior
meets the school or faculty's threshold for evincing unethical conduct. The

CROWELL & MORING LLP
ATTORNEYS AT LAW

CROWELL & MORING LLP
ATTORNEYS AT LAW

list is both incomplete (it only includes those metrics that Mr. Johnson mischaracterizes and presents as the most invasive) and misleading (it strongly implies that Proctorio both controls these metrics and has access to the underlying data, and it inaccurately implies that Proctorio monitors "eye movement"). Mr. Johnson knew or reasonably should have known the falsity of this tweet.

b. **The "[Proctorio] use[s] these metrics" tweet (*Id.* at 31):** In the next tweet, Mr. Johnson again published a list of activities that was both incomplete and misleading for the same reasons as described above in paragraph 58(a).

c. **The "Your attempt can be terminated" tweet (*Id.*):** In a third tweet, Mr. Johnson again published an incomplete and misleading list, this time of activities that either can automatically occur due to technological failures (*i.e.*, internet disconnection) or due to the school or faculty selecting the option and the behavior meeting the school or faculty's threshold for evincing unethical conduct (*i.e.*, switching proxies). The list is both incomplete (it only includes those activities that Mr. Johnson mischaracterizes and presents as the most invasive and punitive) and misleading (it strongly implies that Proctorio both controls these metrics and has access to the underlying data, and also because it strongly implies that Proctorio categorizes students who are flagged for unethical conduct and who are flagged for technical failures in the same fashion).

d. **The "you will have to scan your room" tweet (*Id.*):** And in a fourth tweet that infringes Proctorio's copyrighted material and disparages Proctorio's software, Mr. Johnson published an image that documents the Proctorio software platform's user interface. In this Tweet, Mr. Johnson stated that "Proctorio compiles" room footage "into a street-view like 360 image of your room/house that your professor can access and seemingly proctorio

33

CROWELL & MORING LLP
ATTORNEYS AT LAW

[*sic*] 'agents' too." The infringed image, in combination with this statement, falsely states that Proctorio has consistent and highly sensitive access to the inside of student's private spaces and takes extra steps to invade student privacy even further.

e. **The "virtual machine" tweet (*Id.* at 28):** Four days later, on September 11, 2020, and as part of the same tweet thread, Mr. Johnson published a tweet that includes (1) a link to a page that includes proprietary software code describing the virtual machines that the software disables access to; and (2) directions for how to access that same information on a local computer. This tweet is false because it supports Mr. Johnson's effort through this thread to suggest that he is completing factual research about the technology, when in reality he is posting information to harm the company and its product. More fundamentally, this tweet provides the public with a roadmap of how to circumvent and weaken Proctorio's product and to circumvent the important public interests that the software protects, as Mr. Johnson well knows.

59. Mr. Johnson made numerous other false statements about Proctorio between September 2020 and March 2021. Despite claiming to be a security researcher and knowing the difference between obfuscation and minification, Mr. Johnson repeatedly made false accusations that Proctorio obfuscated code and violated Google policies. Such claims were made on September 22,[21] September 25,[22] October 5,[23] November 6,[24]

---

[21] *See* Ex. B-3 at 22 (After pointing to the Google Chrome Store policy against obfuscation, stating: "Seeing as Proctorio is trying to censor those who are trying to figure out what the extension's detailed functionality is, this seems to be in direct violation of @ChromiumDev's Program Policies.").

[22] *Id.* at 21 (Stating that Proctorio "obfuscates the code for their own extension").

[23] *Id.* at 18 ("You say Proctorio believes in open-source projects, but obfuscate your own product.").

[24] *Id.* at 13 ("[T]hey [Proctorio] actually do use obfuscation, jscrambler to be exact, effectively violating the Google developer guidelines.").

1   November 23,[25] and March 16.[26]  Mr. Johnson's other false statements impugned the

2   veracity of Proctorio's data security measures.  For example, Mr. Johnson stated that

3   Proctorio was lying about its "zero-knowledge encryption" of student data on September

4   7,[27] December 21,[28] February 19,[29] and March 31.[30]  He made these false statements even

5   after, on September 22, 2020, admitting that he does not have an adequate background to

6   make such statements about Proctorio's security technology.[31]

7       60.     The false statements, finally, were not just targeted against the company.

8   Mr. Johnson has consistently made false statements about an online interaction Mr. Olsen

9   had with a student where he clarified the omissions of the student, and the student

10  acknowledged that the omissions were material.[32]  And Mr. Johnson and his team have

11  directed false, misleading, defamatory, and outright outrageous statements at Proctorio's

12  CEO Mr. Olsen as well—including vile, false, and defamatory suggestions that Mr. Olsen

---

[25] *Id*. at 4 (When using the Google Chrome Store's "own language back at" Proctorio, cites to the provision that "Proctorio explicitly agreed to not obfuscate code or conceal functionality of their extension").

[26] Ex. B-1 at 17-18 (Asking Google "why aren't the rules enforced for @proctorio? An extension which obfuscates nearly all of their code…").

[27] Ex. B-3 at 29-30 ("They claim that they use 'zero-knowledge enncription [sic]' and don't have access to data . . . However, I'm not sure how true this statement is when there's clearly a way for 'agents' to view exam streams, when the CEO posts a student's chat logs publicly to attack him, and when they put a law suit against someone linking tutorial videos").

[28] Ex. B-2 at 38-39 (Stating that "'[z]ero-knowledge encryption' is a horrible way to describe what [Proctorio's security] actually is.  It's not.").

[29] *Id*. at 7 ("Stop with the bullshit 'zero-knowledge encryption' talk").

[30] Ex. B-1 at 14 (Re-tweeting a blog post by a classmate that purports to analyze the zero-knowledge encryption technology, and indicating that the technology allows for infiltration when encryption is supposed to be present).

[31] Ex. B-3 at 23 ("From the looks of it, the only thing seemingly 'zero-knowledge about the encryption is how Proctorio integrated it… However, I won't go into detail on that. I'm sure others who know more than I do will do a better job explaining that aspect."). No actual expert has taken up Mr. Johnson's offer to discredit and attack the zero-knowledge encryption technology because it is credible, effective, and secure.  This apparently did not stop Mr. Johnson from speaking publicly (and falsely) on the subject.

[32] This is the so-called student chat scandal, where a student accused Proctorio's chat agent of being insufficiently responsive, and Mr. Olsen identified omissions in the statements that student made and publicized.  *See* Ex. B-3 at 29-30 (where Mr. Johnson falsely states that Mr. Olsen "post[ed] a student's chat logs publicly to attack him").

CROWELL & MORING LLP
ATTORNEYS AT LAW

has a prurient interest in children. Exs. F, G. Mr. Johnson's counsel even went so far to falsely assert outside of this litigation, on behalf of Mr. Johnson, as his agent, that Proctorio engaged in "a form of fraud."[33]

## Mr. Johnson Violated His Promise Not to Access & Disclose Proctorio's Software Platform & Services

61.     Attached herein is the executed agreement between Miami University-Oxford and Proctorio.  *See* Ex. K (the "Agreement").

62.     Proctorio directly licenses its software to colleges and universities, and obligates the school to have student end-users agree to "substantively the same or greater protections for [Proctorio's] Confidential Information and the Application IP."[34]  (*Id.* at 3).  Proctorio is a direct and intended third-party beneficiary of such agreements.  Thus, pursuant to the Agreement, end-users may not "copy or duplicate" any of Proctorio's proprietary source code, and also may not:

> "decompile, disassemble, reverse engineer *or otherwise attempt to obtain or perceive the source code from which any software component of any of the*

---

[33] *See* "Miami student faces legal battle against Proctorio," *Oxford Observer* (May 14, 2021 (herein "Oxford Observer") ("EFF attorneys Cara Gagliano and Hannah Zhao took up the lawsuit on Johnson's behalf. After reviewing the case details, Gagliano sided with Johnson's argument, and even went so far as to view Proctorio's actions as 'a form of fraud.'"), *available at* https://oxfordobserver.org/5451/miami/miami-student-faces-legal-battle-against-proctorio/ (last viewed June 25, 2021).  Proctorio reserves all the rights regarding Ms. Gagliano's potentially-tortious allegations, which appear to have been made from California about a company in Arizona.  Under either state's laws, Ms. Gagliano's statement may be actionable.  "Courts and commentators generally agree that absolute litigation privileges do not protect statements made to the media." *Susan A. v. Cty. of Sonoma*, 2 Cal. App. 4th 88, 96 n.7 (1991); *Green Acres Tr. v. London*, 141 Ariz. 609, 615 (1984) ("The press conference simply did not enhance the judicial function and no privileged occasion arose.  Accordingly, the lawyer defendants were not absolutely privileged to publish the oral and written communications to the newspaper reporter.").

[34] The Agreement defines "Application IP" as the Application Service, the Application Documentation, and any and all intellectual property provided to Customer (and/or any applicable Authorized End Users) in connection with the foregoing." Ex. K at 2.  "Authorized End Users" is defined to expressly include student users.  *Id*.  "Confidential Information" is defined to include "all written or oral information, disclosed by either Party to the other . . . that has been identified as confidential or that by the nature of the circumstances surrounding disclosure ought reasonably to be treated as confidential." *Id*.  This definition also expressly encompasses "Application Documentation," which is defined as "text and/or graphical documentation, whether in electronic or printed format, that describe[s] the features, functions and operation" of the Proctorio software. *Id*.

CROWELL & MORING LLP
ATTORNEYS AT LAW

> *Application IP is compiled or interpreted*, or apply any other process or procedure to derive the source code of any software included in the Application IP, or attempt to do any of the foregoing."

(*Id.* at 1) (emphasis added). The Agreement further states that the school, and thus also the end-user, must "acknowledge[] that nothing in this Agreement will be construed to grant [it or the end-user] any right to obtain or use such source code." (*Id.*)

63.     Mr. Johnson admits to taking classes that use Proctorio's software, and that he has downloaded Proctorio's software onto his local computer. (*See* Compl. ¶¶ 12, 29). Thus, pursuant to the Agreement, Mr. Johnson is prohibited from obtaining, copying, or publicizing Proctorio's source code and associated materials pursuant to the agreement that he entered with Miami University-Oxford.

64.     On information and belief, Mr. Johnson did in fact enter into an end-user agreement with Miami University-Oxford, as required by the Agreement.

65.     At some date prior to September 7, 2020, Mr. Johnson breached the end-user agreement. He breached the agreement in three specific ways. First, he pulled Proctorio's hidden software from the depths of his computer, in violation of the promise not to obtain the source code and accompanying material. Second, he copied Proctorio's software from its hidden location so that he could then disclose it on the Internet, in violation of the promise not to copy. And third, he published the software onto three Internet platforms—Twitter, Pastebin, and GitHub—in violation of the promise to protect the secrecy of such confidential information and in furtherance of the false statements and tortious activities set forth herein.

66.     The specific materials that Mr. Johnson obtained and published in violation of his promise to Proctorio are those same materials he identifies in the Complaint. Namely, the language files and JavaScript files that are installed onto his local computer, and the platform that is built upon the software (the "Copyrighted Material"). Mr. Johnson also stated that he obtained and reviewed other components of Proctorio's proprietary and confidential software, though he did not disclose what other components. (*See* Ex. B-3 at

1    29).[35]  This was in violation of Mr. Johnson's promise to Proctorio as well.

2    ### Mr. Johnson Did Not Fairly Use Proctorio's Copyrights

3           67.      Moreover, by collecting, copying, reproducing, publishing and distributing

4    the Copyrighted Material and other software in violation of his license to use the

5    technology, Mr. Johnson violated Proctorio's copyrights in the same material as well.

6    Proctorio has registered the source code for its software product with the copyright office.

7    (*See* Ex. L) (Registration No. TXu 2-252-620).

8           68.      Mr. Johnson has admitted that Proctorio has a copyright in these materials.

9    All that Mr. Johnson contends is that his use of the materials was fair.  (Compl. ¶¶ 22-27).

10   But this is not accurate.

11          69.      His use of the Copyrighted Material does not contribute to his criticism.

12   Mr. Johnson's (good-faith and bad-faith) criticism engaged with how the software impacts

13   student morale, whether it treats racially-diverse students and students with disabilities

14   differently, and whether it has adequate security measures in place.  Disclosing the

15   Copyrighted Material does not contribute to or impact these criticisms.  The literal

16   proximity of the Copyright Material to these criticisms, and Mr. Johnson's post-hoc

17   litigation justification that they are part of the criticism, does not make it so.  To be fair use

18   as part of his criticism, there needs to be *some* explanation for how the disclosure relates to

19   the criticism, and Mr. Johnson has failed to do that.

20          70.      His use of the Copyrighted Material is not for an educational purpose.

21   Apart from referring to the disclosure as "educational" on a number of occasions, there is

22   nothing in the disclosures that elucidates the educational intent or impact.  If the

23   educational purpose was to help students understand how the software actually functions,

24   then some explanation of the functionality along with the literal disclosure would have

25   been necessary.

26          71.      Instead, Mr. Johnson's disclosure is classic infringement.  He has taken and

27   _____

28   [35] In this tweet, Johnson stated: "End of thread *for now*, but I will update *as I come across more information*." (emphasis added).

CROWELL & MORING LLP
ATTORNEYS AT LAW

disclosed all of the code that is needed for a student to use a virtual machine to circumvent the technology and cheat on an exam. He has disclosed a quantitatively and qualitatively significant part of the copyrighted code, all of which is highly creative. He has presented the code solely to disclose its literal contents and without any modifications or changes made to it. He has presented the copyrighted material solely in furtherance of false and misleading statements, and in bad faith, with the purpose to ultimately destroy the market for the very same copyrighted material. And he has completed these disclosures in order to, in short, try to end Proctorio and to profit personally. Reproducing and otherwise using copyrighted material in furtherance of false and misleading statements, in bad faith, cannot be fair use.

72. Legal and policy rationales to promote speech routinely give way where the speech is false or misleading. This is precisely why legal causes of action exist to prohibit false and misleading statements and have been recognized by courts and legislators for hundreds of years, dating back to British common law. For the same reasons, the legal and policy rationales relating to fair use must give way where copyrighted content is used in furtherance of illegal, false and misleading speech.

### Mr. Johnson's Conduct Has Injured Proctorio, While Mr. Johnson Filed This Lawsuit Despite Having No Injury or Damages

73. Proctorio is here because Mr. Johnson's conduct has caused it real business injuries. Indeed, but for Mr. Johnson's false statements about Proctorio, the company would be in a stronger business position with additional contracts in place and a substantially more secure public reputation.

74. Proctorio's experience with the University of Illinois is illustrative of the wider harm Mr. Johnson has caused. Before Mr. Johnson made his false public statements, Proctorio was in productive business conversations with the University of Illinois to enter a multi-year contractual agreement, likely worth millions of dollars. However, after Mr. Johnson made his false public statements, and due to the statements and their dissemination, the University of Illinois has declined to further extend its contract.

39

75.     Another example is Miami University, where Mr. Johnson has an active practice of circulating materials encompassing his false and misleading statements with the intent to cause the school to cancel its license with Proctorio.  The circulations have had a negative public impact on Proctorio's reputation.  They have also made it more difficult for Proctorio to hold the present business relationship with Miami University, and have constrained the Company's ability to offer additional solutions to the school, too.

76.     Mr. Johnson's publication of private and sensitive materials has put the company and its customers in difficult business and legal circumstances.  Mr. Johnson has sought information about Proctorio from colleges and universities across North America via Freedom of Information Act ("FOIA") and other statutory public records requests.  This is perfectly valid, except that in several of these information productions, Mr. Johnson has received materials that he knows should not have been published due to their confidential and sensitive nature (*e.g.*, faculty access credentials).  Indeed, when such information has been published, Proctorio has tried to notify the university of the accidental disclosure and has tried to protect the integrity of the material.

77.     Despite knowing the sensitive nature of the accidentally released material, Mr. Johnson has published this content online.  In at least one circumstance, this has led to third-party access to highly sensitive software areas of the platform.  In other words, Mr. Johnson's publication of materials he knew should never have been provided to him have allowed unknown persons to access Proctorio's system.

78.     This has both put the contract between Proctorio and the school at risk, and has put at potential risk of publication the confidential information that only the school can access.  This and similarly reckless publications of materials that Mr. Johnson knows he should not have access to has caused serious business and financial harm, and has created threats to the exposure of sensitive personal information.

79.     When Proctorio has taken steps to mitigate the damage caused by the publication of sensitive information, Mr. Johnson has responded by falsely accusing the company of spying on him and, even worse, by placing company employees at risk of

CROWELL & MORING LLP
ATTORNEYS AT LAW

public attack.  In one particular circumstance, he published the name and business title of a Proctorio employee online.  This led in very little time to the employee being harassed online by numerous anonymous persons ("doxing").  The employee was forced to change and/or delete many of her online profiles due to the doxing, and remains concerned moving forward about similar threats from Mr. Johnson and those associated with him.

80.     The false statements have also led to substantial false negative publicity about Proctorio and its leadership.  Because of Mr. Johnson's public crusade against Proctorio, the company has been referred to as "racist" and an "enemy of students," and its products called "spyware."  Moreover, due to Mr. Johnson, Proctorio CEO Mr. Olsen has been referred to as "a creep," as hating students, and as "a pedophile."  None of this is accurate or true.  Proctorio is highly transparent about and fully discloses its products' functionality.  The products' functionality is reasonable and necessary to achieve the products' purpose and to protect important public interests.  Proctorio and Mr. Olsen care deeply about students and the legitimacy and stability of educational institutions.

81.     The defamatory references caused by Mr. Johnson are categorically unfair, inaccurate and untrue.  These are gravely serious, highly damaging accusations that have caused the company substantial business injury.  The company, for example, has been told it cannot attend trade events anymore that it had previously attended for many years.  Potential customers are now profiling the company as untrustworthy and unreliable even before Proctorio has an opportunity to introduce itself.  As a result, Proctorio has been forced to redirect resources from its core business operations and mission to respond to the effects of Mr. Johnson's false and misleading statements about Proctorio.  These are enormously costly injuries.

82.     By contrast, Mr. Johnson has not suffered any legally cognizable damages or injury.  Mr. Johnson has brought a federal case against Proctorio, yet he has admitted both in his civil pleading and on Twitter that he has no civil injury.

83.     All the material that Mr. Johnson hopes to publish is online, on either his Twitter account or his GitHub account.  Indeed, there is no material that he has sought to

CROWELL & MORING LLP
ATTORNEYS AT LAW

41

1  be published that is not presently publicly available through his account.

2        84.      Though Pastebin has taken down the materials, that is because Proctorio

3  filed an abuse claim—*not* a DMCA notice—on the basis of Johnson publishing material

4  that is not his on the website.

5        85.      The result is both absurd and highly frustrating. Proctorio has been injured

6  by Mr. Johnson, and Mr. Johnson bears no actual injury and has incurred no damages. Yet

7  Mr. Johnson has sued Proctorio. Proctorio attempted to resolve Mr. Johnson's situation

8  without resorting to the courts, first through direct outreach to Mr. Johnson, then through

9  the statutorily-authorized DMCA process, then through conversations with his counsel.

10  Because Mr. Johnson and his counsel have expressed no willingness to resolve this dispute

11  despite repeated attempts, Proctorio regrettably must bring these Counterclaims.

**CLAIMS FOR RELIEF**

**<u>Count 1</u>**

**Trade Libel / Injurious Falsehood**

15        86.      Proctorio re-asserts, re-alleges, and incorporates each and every allegation

16  above as if fully set forth herein.

17        87.      Plaintiff's conduct as alleged above constitutes trade libel under Arizona

18  common law.

19        88.      Plaintiff maliciously and intentionally published injurious falsehoods

20  disparaging the quality and character of Proctorio's products and its senior management,

21  including but not limited to the statements made on Twitter identified above. These false

22  statements include, but are not limited to, Mr. Johnson's statements cited in the

23  Counterclaims.

24        89.      On information and belief, Plaintiff made each of these statements

25  knowing they were false, or, in the alternative, with reckless disregard of their truth or

26  falsity.

27        90.      Plaintiff's repeated false statements about Proctorio, its products, and its

28  senior employees were made with the specific intent to harm Proctorio's pecuniary

42

CROWELL & MORING LLP
ATTORNEYS AT LAW

interests.

91.     In the alternative, Plaintiff recognized (or should have recognized) that his repeated misrepresentations about Proctorio, its products, and its senior employees were likely to result in harm to Proctorio's pecuniary interests.

92.     Plaintiff's malicious and disparaging published statements have damaged the reputation and goodwill associated with Proctorio and its products.

93.     Proctorio has suffered pecuniary loss because of the publication of Plaintiff's false statements, and Proctorio is thus entitled to damages for Plaintiff's tortious conduct.

## Count 2

## Breach of Contract

94.     Proctorio re-asserts, re-alleges, and incorporates each and every allegation above as if fully set forth herein.

95.     Pursuant to Proctorio's executed agreement with Plaintiff's university (Miami University-Oxford), Plaintiff was required to agree to refrain from "copy[ing] or duplicat[ing]" any of Proctorio's proprietary source code.

96.     Plaintiff was also required to agree to refrain from any attempt to "decompile, disassemble, reverse engineer or otherwise attempt to obtain or perceive the source code from which any software component of any of the Application IP is compiled or interpreted, or apply any other process or procedure to derive the source code of any software included in the Application IP, or attempt to do any of the foregoing."

97.     Proctorio was the clear intended beneficiary of each of these contract terms.

98.     Agreement to these contractual terms was (and remains) a precondition for any end-user, including Plaintiff, to access Proctorio's software.

99.     On information and belief, Plaintiff has taken classes that use Proctorio's software.  Moreover, Plaintiff admits that he has downloaded Proctorio's software onto his local computer.  (See Compl. ¶¶ 12, 29).  Thus, on information and belief, Plaintiff did in fact enter into an end-user agreement with Miami University-Oxford, as required by

CROWELL & MORING LLP
ATTORNEYS AT LAW

43

Proctorio's agreement with that institution.[36]

100.    Plaintiff's public statements suggest that he is well aware of Proctorio's terms of service, but that he believes they just "don't matter."[37]

101.    Thus, on information and belief, Plaintiff explicitly agreed to refrain from copying, duplicating, or publicizing Proctorio's source code and associated materials pursuant to the end-user agreement that he entered with Miami University-Oxford.

102.    At some date prior to September 7, 2020, Plaintiff breached those contractual promises, in at least three ways:

a.  First, Plaintiff pulled Proctorio's hidden software from the depths of his computer, in violation of the promise not to obtain the source code and accompanying material.

b.  Second, Plaintiff copied Proctorio's software from its hidden location specifically with the intention of disclosing it on the Internet, in violation of his promise not to copy.

c.  Third, Plaintiff published the software onto at least three Internet platforms—Twitter, Pastebin, and GitHub—in violation of the promise to protect the secrecy of such confidential information.

103.    The specific materials that Plaintiff obtained and published in violation of his promise to Proctorio are those same materials he identifies in the Complaint—namely, the language files and JavaScript files that he installed onto his local computer.

104.    Plaintiff has also stated that he obtained and reviewed other components of Proctorio's proprietary and confidential software, but he did not specifically identify the software components he obtained.  (See Ex. B-3 at 29).  On information and belief, this act

---

[36] Proctorio's counsel has requested this documentation from Miami University's legal department, but that office is understandably reluctant to disclose that information short of a subpoena, and certainly before a protective order has been entered.

[37] See "Oxford Observer," supra n. 33 (quoting Mr. Johnson: "Proctorio's terms of service don't matter until you actually use the software and click the checkbox before you take an exam.").

CROWELL & MORING LLP
ATTORNEYS AT LAW

also violated Plaintiff's contractual promises specifically intended to benefit Proctorio.

105.    Even after being informed that his conduct violated these contractual agreements, Plaintiff refused to remove the infringing posts (and, in fact, re-tweeted them).

106.    As a result of Plaintiff's contract breaches, Proctorio has been significantly damaged, including, *inter alia*, through lost profits, reputational damage, and the more fundamental injury of Plaintiff's conduct to intentionally provide the public with means of circumventing the effectiveness of Proctorio's product—exactly the kind of harms that these contractual terms are designed to prevent.

107.    Because this count arises out of contract, pursuant to A.R.S. § 12-341.01, Proctorio is also entitled to an award of its reasonable attorneys' fees.

### Count 3

### Copyright Infringement

108.    Proctorio re-asserts, re-alleges, and incorporates each and every allegation above as if fully set forth herein.

109.    Proctorio owns the copyright for the Copyrighted Material.

110.    Proctorio has registered the Copyrighted Material with the United States Copyright Office.  A true and correct copy of the certificate of this federal copyright registration, which bears Registration Number TXu-2-252-620, is attached as **Exhibit L**.

111.    Counterdefendant freely admits, both on Twitter and in his complaint in the instant action, that he copied Proctorio's Copyrighted Material.

112.    Counterdefendant willfully published Proctorio's Copyrighted Material. Even after he was made aware of his infringing conduct by reviewing Proctorio's DMCA notices, Counterdefendant continued to willfully publish Proctorio's Copyrighted Material.  Indeed, even after platforms had removed his infringing content, Counterdefendant circumvented those platforms and continued to willfully publish Proctorio's Copyrighted Material on different platforms.  As of the date of this filing, on information and belief, Counterdefendant has still not removed his public posts containing Proctorio's Copyrighted Material from certain platforms.

CROWELL & MORING LLP
ATTORNEYS AT LAW

113.     Counterdefendant willfully induced others to publish and use Proctorio's Copyrighted Material.  Even after he was made aware of his infringing conduct by reviewing Proctorio's DMCA notices, Counterdefendant continued to willfully induce others to publish and use Proctorio's Copyrighted Material.

114.     The Copyright Act authorizes a damages award of up to $150,000 per work infringed due to Counterdefendant's willful infringement.  *See* 17 U.S.C. § 504(c). Proctorio is entitled to an award of damages in that amount, or another amount to be proved at trial.

115.     The Copyright Act authorizes the Court to enjoin Counterdefendant's continued publication of Proctorio's Copyrighted Material.  Because Counterdefendant admits that he would persist in his infringing conduct but for Proctorio's assertion of legal rights (*see, e.g.*, Compl. ¶ 50), Proctorio requests that the Court issue such an injunction.

116.     The Copyright Act authorizes the Court to award attorneys' fees and litigation costs.  *See* 17 U.S.C. § 505.

117.     Despite multiple attempts to amicably resolve the conduct short of litigation, Counterdefendant refused to stop infringing Proctorio's Copyrighted Material. *See, e.g.*, Compl. ¶ 28 (Proctorio's CEO directly attempts to resolve the matter); *id.* at ¶¶ 37-41 (Proctorio's counsel attempts to resolve the matter).  As such, Proctorio is entitled to an award of its attorneys' fees and litigation costs.

**Count 4**

**Tortious Interference with Contract and/or Business Expectancy**

118.     Proctorio re-asserts, re-alleges, and incorporates each and every allegation above as if fully set forth herein.

119.     For years, Proctorio has valid contractual relationships and/or valid business expectancies with third parties, including universities like Miami University, the University of British Columbia, and the University of Illinois.

120.     Counterdefendant knew that Proctorio had these valid contractual relationships and/or business expectancies with universities across the country—including

46

his own.  *See supra, e.g.*, ¶ 19.  Indeed, Counterdefendant's pleading in the instant case references some of these relationships.

121.    Notwithstanding this knowledge—and, indeed, specifically because he knew of these relationships and wished to "abolish online proctoring"—Counterdefendant actively induced universities, including his own, to terminate their current and/or prospective business relationships with Proctorio.  Acting with an improper motive and to advance his own personal interests through a campaign of false statements on Twitter and via other media outlets, Counterdefendant (and his allies) acted improperly.

122.    Counterdefendant acted in concert with others, including but not limited to Mr. Ian Linkletter, to intentionally spread misinformation about Proctorio, its products, and its senior employees in a specific attempt to induce educational institutions to terminate their current and/or prospective business relationships with Proctorio.  To spread these false statements, Counterdefendant also acted in concert with sympathetic organizations like "Fight for the Future."

123.    Counterdefendant's campaign of lies worked.  As he hoped it would be, Proctorio has been damaged through serious disruptions with both its ongoing and prospective business relationships.  As a result of the false statements that Counterdefendant and his co-tortfeasors publicized over several months, certain educational institutions have narrowed, terminated, or refused to renew contracts with Proctorio.  Others have raised concerns about these false allegations during the request-for-proposals or contracting processes.  Still others have announced total bans on remote proctoring technology of any kind.

## DEMAND FOR JURY

Counterclaimant Proctorio demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Proctorio, Inc. prays, as follows, that:

1.    Mr. Johnson take nothing by reason of his complaint;

2.    The complaint against Proctorio be dismissed in its entirety;

CROWELL & MORING LLP
ATTORNEYS AT LAW

47

1       3.      Proctorio be awarded damages in an amount to be determined at trial;

2       4.      The Court enjoin Mr. Johnson from engaging in further conduct that infringes Proctorio's copyrighted material or unlawfully disparages Proctorio, its products, or its senior executives;

5.      Proctorio be awarded its reasonable attorneys' fees and costs incurred; and

6.      The Court order such other and further relief as it deems just and proper.

Dated: **September 7, 2021**          Respectfully submitted,

By: _____

Justin D. Kingsolver
   JKingsolver@crowell.com
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone: 202-624-2500

Gabriel M. Ramsey*
   GRamsey@crowell.com
Kristin Madigan*
   KMadigan@crowell.com
Kayvan M. Ghaffari*
   KGhaffari@crowell.com
Jacob Canter*
   JCanter@crowell.com
**CROWELL & MORING LLP**
3 Embarcadero Center, 26th Floor
San Francisco, California 94111
Telephone: 415-986-2800

   *Admitted pro hac vice.

*Attorneys for Defendant Proctorio, Inc.*

CROWELL & MORING LLP
ATTORNEYS AT LAW

48

1

**CERTIFICATE OF SERVICE**

2       I hereby certify that on September 7, 2021, I caused the foregoing document to be

3  electronically filed with the Clerk of the Court using the Court E-Filing system, which

4  sends notification of such filings to all registered participants.

5

6                       By:  */s/ Justin D. Kingsolver*

7

8                       Justin D. Kingsolver

                        Attorney for Proctorio, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROWELL & MORING LLP
ATTORNEYS AT LAW

Exhibit C

1
2
3
4
5
6 **IN THE UNITED STATES DISTRICT COURT**
7 **FOR THE DISTRICT OF ARIZONA**
8
9 Erik Johnson,                              No. CV-21-00691-PHX-DLR
10              Plaintiff,                    **PROTECTIVE ORDER**
11 v.
12 Proctorio Incorporated,
13              Defendant.
14

15      The Court having reviewed the parties' Stipulation for Protective Order (Doc. 53),
16 and good cause appearing,

17      **IT IS ORDERED** that, pursuant to the parties' stipulation, a Protective Order is
18 entered as follows:

19      Pursuant to Federal Rules of Civil Procedure Rule 26(c), the following provisions
20 shall govern the pretrial disclosure and use by the parties of documents, electronically
21 stored information ("ESI"), testimony, and other information (collectively "Information")
22 given during the course of discovery. Nothing herein is intended to preclude a party from
23 objecting to discovery or disclosure based on a claim of privilege, work product, relevancy
24 or any other grounds permitted by applicable law, including without limitation, that the
25 Information is proprietary or a trade secret and is not subject to disclosure in spite of the
26 existence of this Order. The existence of this Order, standing alone, is not a basis to compel
27 disclosure of such Information.

28

1.   <u>Introduction and Scope</u>. Discovery in this case may require disclosure of Information which the parties or producing party (the "Producing Party") consider confidential in nature and which may require protection against unrestricted disclosure and use. This Order shall govern documents and information exchanged during this action, including, but not limited to, documents produced by the parties or non-parties, deposition testimony, testimony taken at a hearing or other proceeding, interrogatory answers, discovery responses, and correspondence between counsel. "Receiving Party" means any party who receives Information from a Producing Party.

2.   <u>Designation of Certain Information as "CONFIDENTIAL."</u> The Producing Party may designate Information as "CONFIDENTIAL" if such Information contains non-public, sensitive, or confidential information. Such Information shall be so identified at the time of service of such Information by including on each page the legend "CONFIDENTIAL." For digital files being produced, the Producing Party may mark each viewable page or image with the legend "CONFIDENTIAL."

The designation of any document, material, or information as "CONFIDENTIAL," in the manner described above, shall constitute a certification by the attorney reviewing the material and making such designation that he or she in good faith believes the material is confidential or otherwise entitled to protection under Fed. R. Civ. P. 26(c)(1)(G).

3.   <u>Designation of Certain Information as "ATTORNEY EYES ONLY."</u> A Producing Party may designate Information as "ATTORNEY EYES ONLY" if such Information contains especially sensitive confidential information that is not generally known or determinable from publicly available sources; that derives commercial value from remaining confidential; and that, in the good faith judgment of the Producing Party, is substantially likely to cause competitive injury to the Producing Party if disclosed to the other parties in this litigation. Such Information shall be so identified at the time of service of such Information by including on each page the legend "ATTORNEY EYES ONLY." For digital files being produced, the Producing Party may mark each viewable page or image with the legend "ATTORNEY EYES ONLY."

- 2 -

The designation of any document, material, or information as "ATTORNEY EYES ONLY," in the manner described above, shall constitute a certification by the attorney reviewing the material and making such designation that he or she in good faith believes the material deserves this heightened level of protection. A party designating Information as "ATTORNEY EYES ONLY" may do so only upon a good faith belief that disclosure other than subject to these terms is substantially likely to cause the Producing Party to suffer harm to its competitive interests. In accordance with its extraordinary nature, the "ATTORNEY EYES ONLY" designation should be used sparingly and in limited circumstances. *See Ragland v. Blue Cross Blue Shield of N. Dakota*, 1:12-CV-080, 2013 WL 3776495, at *2 (D.N.D. June 25, 2013) ("[D]esignation of material as 'attorneys' eyes only' should be reserved for only those rare instances in which it is truly justified, *i.e.,* when there is a real expectation and entitlement to confidentiality under the law that has been preserved and not waived and there is no other effective alternative. . . . In other words, it should not be authorized simply because one of the parties would prefer that certain information not be disclosed to an opposing party.").

4. <u>Designation of Certain Information as "SOURCE CODE."</u> A Producing Party may designate Information as "SOURCE CODE" if such Information is computer code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs, and that in the good faith judgment of the Producing Party, is likely to create a substantial risk of serious competitive harm to the Producing Party if disclosed to other parties in this litigation.

The designation of any document, material, or information as "SOURCE CODE," in the manner described above, shall constitute a certification by the attorney reviewing the material and making such designation that he or she in good faith believes the material deserves this heightened level of protection. A party designating Information as "SOURCE CODE" may do so only upon a good faith belief that disclosure other than subject to these terms is substantially likely to cause the Producing Party to suffer harm to its competitive

interests. For avoidance of doubt, no document, material, or information available on the public docket in this case as of the date of the entry of this order may be designated as "SOURCE CODE."

5. <u>Limitations on Access to Information</u>. Except as otherwise provided in this Order, "CONFIDENTIAL," "ATTORNEY EYES ONLY," and "SOURCE CODE" Information shall not, without prior written consent of the Producing Party, (a) be disclosed to anyone other than the Court, its officers and its clerical staff, and the relevant Authorized Personnel specified in Paragraphs 6, 7, and 8 of this Order; or (b) be used by anyone other than the Producing Party for any purpose whatsoever other than the prosecution or defense of this litigation. Nothing in this Order shall affect any confidentiality obligations to which the parties may be subject pursuant to agreements independent of this litigation.

6. <u>Limitations on Access to "CONFIDENTIAL" Information</u>. Access to and disclosure of "CONFIDENTIAL" Information marked and identified in accordance with this Order shall be limited to the Court, its officers and its clerical staff, and to the "Confidential Authorized Personnel." Confidential Authorized Personnel are:

(a) Outside counsel for the parties to this lawsuit, including paralegal, secretarial, and clerical personnel reasonably necessary to assist such counsel;

(b) Any individual party, or for any party that is not an individual, not more than three representatives who are officers or employees of the party, who may be, but need not be, in-house counsel for the Receiving Party, as well as their immediate paralegals and staff, to whom disclosure is reasonably necessary for this case, provided that each such person has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A;

(c) Any outside expert or consultant and their staff who are retained by a party or attorney to assist in this action. A party desiring to disclose "CONFIDENTIAL" (or "ATTORNEY EYES ONLY" or "SOURCE CODE") Information to experts or consultants shall first obtain from each expert or consultant an Acknowledgement in the form provided in Exhibit A, and the attorney for the party shall keep the executed

- 4 -

Acknowledgement for one year following the final termination of this Civil Action. The disclosing attorney must have a good faith belief that disclosure of such documents to the expert or consultant is necessary for the expert or consultant's review of the issues in this Civil Action.

(d)     Employees of outside vendors providing document production services, copy services, and exhibit preparation services in connection with this litigation provided that each vendor execute an Acknowledgement in the form provided in Exhibit A;

(e)     Stenographic reporters and videographers engaged for depositions or proceedings necessary to this action;

(f)     Any person (i) who is identified as an author or recipient, including receipt by copy, of any document or information therein and is not otherwise shown prior to such disclosure not to have received the document or information therein or (ii) who has been identified in writing by the Producing Party as having been provided with the document or information therein. Such person shall be considered "Confidential Authorized Personnel" solely with respect to the specific document or information therein;

(g)     Third-party mediators selected by the parties;

(h)     Any other person with the prior written consent of the Producing Party.

7.     <u>Limitation on Access to "ATTORNEY EYES ONLY" Information</u>. Access to and disclosure of "ATTORNEY EYES ONLY" Information marked and identified in accordance with this Order shall be limited to the Court, its officers and its clerical staff and to the "AEO Authorized Personnel." AEO Authorized Personnel are:

(a)     Outside counsel of record for the parties to this lawsuit, including other attorneys in the law firm, and paralegal, secretarial, and clerical personnel reasonably necessary to assist such counsel;

(b)     Any outside expert or consultant and their staff who are retained by a party or attorney to assist in this action, but only to the extent reasonably necessary to

perform such work. A party desiring to disclose "ATTORNEY EYES ONLY" Information to experts or consultants shall first obtain from each expert or consultant an Acknowledgement in the form provided in Exhibit A, and the attorney for the party shall keep the executed Acknowledgement for one year following the final termination of this Civil Action. The disclosing attorney must have a good faith belief that disclosure of such documents to the expert or consultant is necessary for the expert or consultant's review of the issues in this Civil Action.

(c) Employees of outside vendors providing document production services, copy services, and exhibit preparation services in connection with this litigation provided that each vendor execute an Acknowledgement in the form provided in Exhibit A;

(d) Stenographic reporters and videographers engaged for depositions or proceedings necessary to this action;

(e) Any person (i) who is identified as an author or recipient, including receipt by copy, of any document or information therein and is not otherwise shown prior to such disclosure not to have received the document or information therein or (ii) who has been identified in writing by the Producing Party as having been provided with the document or information therein. Such person shall be considered "AEO Authorized Personnel" solely with respect to the specific document or information therein;

(f) Third-party mediators selected by the parties;

(g) Any other person with the prior written consent of the Producing Party.

8. <u>Limitation on Access to "SOURCE CODE" Information.</u>

(a) Protected material designated as "SOURCE CODE" shall be made available only for an in-person inspection, in a format allowing it to be reasonably reviewed and searched, during normal business hours or at other mutually agreeable times, at an office of the Producing Party's counsel or another mutually agreed upon location. The "SOURCE CODE" shall be made available for inspection on a secured computer in a

secured room without Internet access or network access to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the "SOURCE CODE" onto any recordable media or recordable device. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any "SOURCE CODE" review, but only to ensure that there is no unauthorized recording, copying, or transmission of the "SOURCE CODE" It may be appropriate under certain circumstances to require the Receiving Party to keep a paper log indicating the names of any individuals inspecting the source code and dates and times of inspection, and the names of any individuals to whom paper copies of portions of source code are provided.

(b)     The Receiving Party may request paper copies of no more than 25 consecutive pages and no more than 250 pages total (unless otherwise agreed in writing or approved by the Court) of portions of "SOURCE CODE" that are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purposes of reviewing the "SOURCE CODE" other than electronically as set forth in paragraph (a) in the first instance. The Producing Party shall provide all such "SOURCE CODE" in paper form including bates numbers and the label "SOURCE CODE."

(c)     The Receiving Party shall maintain a record of any individual who has inspected any portion of the "SOURCE CODE" in electronic or paper form. The Receiving Party shall maintain all paper copies of any printed portions of the "SOURCE CODE" in a secured, locked area. The Receiving Party shall not create any electronic or other images of the paper copies and shall not convert any of the information contained in the paper copies into any electronic format. The Receiving Party shall only make additional paper copies if such additional copies are (1) necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report), (2) necessary for deposition, or (3) otherwise necessary for the preparation of its case. Any paper copies used during a deposition shall be retrieved by the Producing Party at the end of each day and must not be given to or left with a court reporter or any other unauthorized individual. In the event

depositions are held remotely, the parties agree to work in good faith to ensure that copies of material designated as "SOURCE CODE" are reasonably available to the deponent during such depositions.

(d)     Protected material designated as "SOURCE CODE" may be present on Information that is produced during the normal course of discovery (i.e., emails or internal memoranda).  In such circumstances, "SOURCE CODE" Information shall be subject to all of the protections afforded "ATTORNEY EYES ONLY" Information.

9.     <u>Designation of Deposition or Other Testimony</u>.  Deposition and other testimony may also be designated as "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE."  Parties or testifying persons or entities may designate depositions and other testimony with the appropriate designation by indicating on the record at the time the testimony is given or by sending written notice of how portions of the transcript of the testimony is designated within 30 days of receipt of the transcript of the testimony (the "Designation Time Period").  If no indication on the record is made, all information disclosed during a deposition shall be deemed "CONFIDENTIAL" during the Designation Time Period.  Any party that wishes to disclose the transcript, or information contained therein, not designated confidential pursuant to this Protective Order prior to the expiration of the Designation Time Period may provide written notice of its intent to treat the transcript as non-confidential, after which time any party that wants to maintain any portion of the transcript as confidential must designate the confidential portions within 14 days, or else the transcript may be treated as non-confidential.  If no designation is made prior to the end of the Designation Time Period, the transcript will not be confidential.

Any "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information that is used in the taking of a deposition shall remain subject to the provisions of this Protective Order, along with the transcript pages of the deposition testimony dealing with such "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information.  In such cases the court reporter shall be informed of this Protective Order and shall be required to operate in a manner consistent with this Protective Order.  In the

event the deposition is videotaped, the original and all copies of the videotape shall be marked by the video technician to indicate that the contents of the videotape are subject to this Protective Order, substantially along the lines of "This videotape contains confidential testimony used in this case and is not to be viewed or the contents thereof to be displayed or revealed except pursuant to the terms of the operative Protective Order in this matter or pursuant to written stipulation of the parties."

Counsel for any Producing Party shall have the right to exclude from oral depositions any person who is not authorized by this Protective Order to receive or access "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information based on the designation of such Information other than the deponent, deponent's counsel, the reporter and videographer (if any). Such right of exclusion shall be applicable only during periods of examination or testimony regarding such "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information. A party may not exclude another party from an entire deposition without giving notice of its intention to do so promptly upon receipt or service of the Notice of Deposition and giving the other party an opportunity to object to such exclusion. Nothing in this provision is intended to alter the rules for who can attend portions of depositions that are not designated as confidential.

10.  <u>Party's Own Information</u>. The restrictions on the use of Information established by this Protective Order are applicable only to Information received by a party from another party or from a non-party as a direct result of this litigation. A party is free to do whatever it desires with its own Information.

11.  <u>Related Material</u>. The restrictions on the use of Information established by this Protective Order shall extend to: (i) all copies, extracts, and complete or partial summaries prepared from such Information; and (ii) portions of briefs, memoranda, or any other writing filed with the Court and exhibits thereto that contain or reflect the content of any such Information, copies, extracts, or summaries, provided that such writings are

identified as containing "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information.

    12.    <u>Procedures for Filing Designated Material</u>.

    (a)    Absent written permission from the Producing Party or a court order secured after appropriate advance notice to all interested persons, a Receiving Party may not file or disclose in the public record any "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information.

    (b)    Any party seeking to file any documents with the Court in this action that contain or attach "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information shall lodge such documents under seal pursuant to the Court's rules and filing procedures, including LRCiv 5.6 and the Electronic Case Filing Administrative Policies and Procedures Manual, to the extent necessary after the parties confer as required by LRCiv 5.6. In addition to lodging the documents under seal, the party shall also lodge a publicly accessible version of the documents, with the "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information redacted.

    (c)    The conference required by LRCiv 5.6(d) shall occur no later than three business days before the anticipated filing date. At that conference, the parties shall also confer about appropriate redactions. If the parties are unable to agree on whether sealing is justified and/or what material must be redacted, then the party that wishes to file the document or refer to the "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information must email the document and identify the Information to be included to the party who designated the material no later than two business days before the anticipated filing date in order to allow the Producing Party to identify appropriate redactions, and the party that wishes to file the document shall adopt those redactions in the publicly accessible versions of the document.

    (d)    Nothing in this Protective Order shall be construed as automatically permitting a party to file any document under seal. *See Kamakana v. City and County of*

*Honolulu*, 447 F.3d 1172, 1174 (9th Cir. 2006); *Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1101 (9th Cir. 2016).

13. <u>Use of Information at Hearing or Trial</u>. At any hearing or trial relating to this proceeding, subject to the rules of evidence and any Order of the Court, a party may use any "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information for any purpose. In the event that any "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information is used in any court proceeding in connection with this litigation, it shall not lose its status as "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information through such use, provided that the parties to this action take steps reasonably calculated to protect its confidentiality during such use. The parties may request that attendance at those portions of the hearing or trial or access to the transcripts of those hearings or the trial in which "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information is disclosed be restricted to court personnel and persons authorized to receive disclosure by this Protective Order.

14. <u>Challenge to Designation</u>. In the event that the Receiving Party disagrees with a designation by the Producing Party, then the parties initially will try to resolve the dispute on an informal basis, within five business days from the date that the Receiving Party raises the objection to the designation (or a mutually agreed upon longer period) in writing. Any such objection must be asserted in writing. Any disputed items shall be treated as "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information, as designated, and subject to the protections of this Order unless and until the Producing Party withdraws the designation in writing or the Court rules that the disputed items are not entitled to the designation. If the parties are unable to resolve their differences informally, then the objecting party may initiate a discovery dispute conference call consistent with the terms of this Court's Rule 16 Scheduling Order to request disclosure.

In connection with any procedure initiated under this provision, the party designating the information as "CONFIDENTIAL" (or "ATTORNEY EYES ONLY" or

"SOURCE CODE") shall bear the burden of establishing that good cause exists for the disputed information to be so treated. Neither party shall be obligated to challenge the propriety of a "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" designation, and failure to do so shall not constitute an admission that any Information is in fact properly designated as "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE." Information marked and identified in accordance with this Protective Order shall remain subject to the terms of this Protective Order unless otherwise agreed by the Producing Party or ordered by the Court.

15. <u>Subpoenas or Court Orders</u>. If at any time "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information is subpoenaed by any court, arbitral, administrative, or legislative body, the party to whom the subpoena or other request is directed shall immediately give prompt written notice thereof to every party who has produced such Information and to its counsel, and shall provide each such party with an opportunity to object to the production of the Information as precluded by this Protective Order or move for a protective order regarding the production of "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information  implicated by the subpoena.

16. <u>Other Protections</u>.

(a)    This Protective Order shall not preclude any party from seeking additional protection with respect to the confidentiality of Information as that party deems appropriate, including seeking certain processes be put into place through either a separate Order of the Court or by agreement of the parties. Nor shall any party be precluded from seeking an order from the Court permitting the disclosure or use of certain Information otherwise prohibited by this Protective Order;

(b)    Nothing herein shall prevent the parties from mutually agreeing in writing to the use or disclosure of "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information other than as permitted by this Order;

(c)     If the Court orders that access to or dissemination of any type of Information shall be had by or made to persons not included in Paragraphs 5, 6, or 7 above, such matters shall only be accessible to, or disseminated to, such persons based upon the conditions pertaining to, and the obligations arising from, this Order, and such persons shall sign an Acknowledgment as provided for in Exhibit A of this Order, and in all other respects shall be considered subject to it; and

(d)     If it becomes necessary for counsel for a party receiving "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information to seek the assistance of any person other than those specified in Paragraph 5, 6, or 7 above, the following procedures shall be employed:

(i)     Counsel for the Receiving Party shall notify, in writing, counsel for the Producing Party of the desire to disclose such "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information and shall identify the person(s) to whom counsel intends to make such disclosure;

(ii)     If no objection to such disclosure is made by counsel for the Producing Party within five business days of such notification, counsel for the Receiving Party shall be free to make such disclosure to the designated person(s);

(iii)     If the Producing Party objects to such disclosure, no disclosure shall be made at that time. However, any party may bring before the Court the question of whether the particular "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information can be disclosed to the designated person(s), and the party making the designation shall have the burden of establishing before the Court the necessity for such designation.

17.     <u>Inadvertent Failure to Designate</u>. If, through inadvertence, a Producing Party provides any "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information in this litigation without marking the information as "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" the Producing Party may subsequently inform the Receiving Party in writing of the "CONFIDENTIAL,"

"ATTORNEY EYES ONLY," or "SOURCE CODE" nature of the disclosed Information, and the Receiving Party shall treat the disclosed information in accordance with this Order after receipt of such written notice and shall make reasonable efforts to retrieve any such material that has been disclosed to persons not authorized to receive the material under the terms hereof. The Producing Party must promptly reproduce the disclosed Information with the correct confidentiality designation, after which time the Receiving Parties shall return or securely destroy the improperly designated copies. Prior disclosure of material later designated as "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" by the non-designating party or a third party shall not constitute a violation of this Order, unless an objectively reasonable person would have realized that the Information should have been appropriately designated with a confidentiality designation under this Order.

18. <u>Inadvertent Disclosure</u>. If "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information is disclosed to any person other than in the manner authorized by this Order, the person responsible for the disclosure must immediately bring all pertinent facts relating to such disclosure to the attention of counsel for the Producing Party and, if appropriate, to the Court and, without prejudice to other rights and remedies of any party, take reasonable and appropriate measures to retrieve the improperly disclosed Information and prevent further disclosure.

19. <u>Inadvertent Disclosure of Privileged Material</u>. If a Producing Party through inadvertence produces or provides Information that it believes is subject to a claim of attorney-client privilege, work product immunity, or any other privilege, the Producing Party may give prompt written notice to the Receiving Party that the Information is deemed privileged and that return of the Information is requested, in which case the inadvertent disclosure will not waive the applicable privilege and/or protection. Upon such written notice, the Receiving Party shall immediately gather the original and all copies of the Information of which the Receiving Party is aware and shall immediately return or securely destroy the original and all such copies. Return of this Information by the Receiving Party shall not preclude the Receiving Party from later moving the Court to compel production

- 14 -

of the returned Information, and shall not prevent the Receiving Party from preparing a record for its own use containing the date, author, addresses, and topic of the inadvertently produced Information and such other details as are reasonably necessary to identify the Information and describe its nature to the Court in any motion to compel production.

20. <u>Guidance Regarding Paragraphs 2–4.</u> The parties agree that the definitions of "CONFIDENTIAL," "ATTORNEY EYES ONLY," and "SOURCE CODE" in Paragraphs 2 through 4 of this Order are likely not met when the Information:

(a) is, at the time of disclosure, available to the public, by publication or otherwise, through no act or failure to act on the part of the Receiving Party or their agents, and is not otherwise protected from disclosure as a result;

(b) becomes at any time, through no act or failure to act on the part of the Receiving Party, available to the public, by publication or otherwise;

(c) is determinable from publicly available sources, through no act or failure to act on the part of the Receiving Party;

(d) is already in the possession of a party at the time of disclosure by the other party and was acquired under conditions not requiring the confidential treatment of the material, other than directly or indirectly from the Producing Party; or

(e) is made available to a party by a third-party who obtained the same by legal means and without any obligation of confidence to the party claiming its confidential nature.

This paragraph constitutes guidance regarding the interpretation of Paragraphs 2 through 4 and does not supersede Paragraph 12. Each party retains the right to make its own designations, and a designation may be changed only if the parties engage in the process described in Paragraph 12 or through some other process that provides adequate notice to the Producing Party and an opportunity for communication between the parties.

21. <u>Return of Information</u>.

(a) After this case is completed, including the exhaustion of all appeals, each party, unless otherwise agreed in writing by counsel for the parties, shall have 90

- 15 -

calendar days to notify the other party in writing whether it wants (1) the return of its produced materials designated as "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" including all copies, extracts, and summaries thereof; or (2) the destruction of these materials by the party, person, or firm in possession. Any documents, copies, extracts or summaries that constitute attorney work product may be retained by counsel or destroyed. The return or destruction of these materials shall occur within 60 days after this written notice is received. Upon request, the party returning or destroying materials under this paragraph shall provide a written certificate to the Producing Party attesting to the return or destruction of all designated materials.

(b)     The parties and their counsel will not be required to destroy electronic backups containing "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" information, provided that (1) the electronic backups are kept in the ordinary course of business and are not specific to this case; (2) if, in the ordinary course of business, the backups are destroyed on a normal schedule, then the backups containing "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" information must be destroyed on that normal schedule; and (3) the parties or their counsel must continue to comply with the requirements of this Protective Order until all such electronic backups have been destroyed.

22.     <u>Waiver or Termination</u>. The provisions of this Protective Order may not be modified, waived, or terminated except by the written stipulation of counsel or order of the Court. This Order shall survive the final termination of this proceeding with respect to any retained "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information. Unless otherwise agreed by the parties or further court order, termination of the proceedings shall not relieve any person from the obligations of this Protective Order.

<u>Notice</u>. All notices required by this Protective Order are to be served via email or hand-delivery to counsel for the parties. The computation of any period of time prescribed or allowed by this Order shall be governed by the provisions for computing time set forth in Federal Rules of Civil Procedure 6. Any of the notice requirements herein may be

waived in whole or in part, but only in writing signed by an attorney for the party designating Information under this Order.

Dated this 13th day of December, 2021.

Douglas L. Rayes
United States District Judge

1    **EXHIBIT A**

2

3

4

5

6    **IN THE UNITED STATES DISTRICT COURT**

7    **FOR THE DISTRICT OF ARIZONA**

8

9    Erik Johnson,                              No. CV-21-00691-PHX-DLR

10                 Plaintiff,          **DECLARATION AND AGREEMENT**
                                       **TO BE BOUND BY STIPULATED**
11   v.                                **PROTECTIVE ORDER**

12   Proctorio Incorporated,

13                 Defendant.

14

15       I, _____, declare that:

16       1.     My address is _____

17   _____.

18       2.     My present employer is _____ and

19   the address of my present employer is _____

20   _____.

21       3.     I have read and know the contents of the Stipulated Protective Order (the

22   "Order") dated _____.

23       4.     I acknowledge that I am one of the persons described in the Order, and I am

24   executing this Declaration in order to satisfy the conditions provided in the Order prior to

25   the disclosure to me of any "CONFIDENTIAL," "ATTORNEY EYES ONLY," or

26   "SOURCE CODE" Information as defined in the Order.

27       5.     I have read and agree to be fully bound by the terms of the Order.

28

- 18 -

6.      All such documents and information disclosed to me pursuant to the Order will be maintained by me in strict confidence, and I will not disclose or use the original or any copy of, or the subject of, such documents and/or information except in accordance with the Order.

7.      I will not use or refer to any of the aforesaid documents and/or information, or copies thereof, other than in connection with the above-entitled action and as provided in the Order.

8.      Upon being notified of the termination of the above-entitled action, I will return all copies of such documents to counsel from whom I received the documents, and I will destroy any notes and/or memoranda I have regarding the aforesaid documents and/or information.

9.      I acknowledge that, by signing this agreement, I am subjecting myself to the jurisdiction of the United States District Court for the District of Arizona with respect to the enforcement of the Order.

10.    I understand that any disclosure or use of "CONFIDENTIAL," "ATTORNEY EYES ONLY," or "SOURCE CODE" Information in any manner contrary to the provisions of the Order may subject me to sanctions for contempt of court.

I declare under penalty of perjury that the foregoing is true and correct.


Date: _____


Signature: _____

Exhibit D

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Erik Johnson,

        Plaintiff,

v.

Proctorio Incorporated,

        Defendant.

No. CV-21-00691-PHX-DLR

**ORDER REGARDING DISCOVERY OF ELECTRONICALLY STORED INFORMATION**

The Court having reviewed the parties' Stipulation for Order Regarding Discovery of Electronically Stored Information (the "ESI Motion") (Doc. 54), and good cause appearing,

**IT IS ORDERED** that, pursuant to the parties' Stipulation, the Court enters the following order regarding discovery of electronically stored information:

1.     Nothing in this Order prevents the parties from agreeing to use technology assisted review and other techniques insofar as their use improves the efficacy of discovery.

2.     The parties agree to produce documents in the formats described in Appendix 1 to this Order. If particular documents warrant a different format, the parties will cooperate to arrange for the mutually acceptable production of such documents. The parties agree not to degrade the searchability of documents as part of the document production process.

3.     Pursuant to Federal Rule of Evidence 502(d), the production of a privileged or work-product-protected document, whether inadvertent or otherwise, is not a waiver of privilege or protection from discovery in this case or in any other federal or state

proceeding. For example, the mere production of privileged or work-product-protected documents in this case as part of a mass production is not itself a waiver in this case or in any other federal or state proceeding.

4. No provision of this Order affects the inspection or production of source code which will be collected and made available consistent with the Stipulated Protective Order governing this case. To the extent source code files are contained within emails, as attachments to emails, or embedded within other ESI produced in accordance with this order, a slip sheet shall be provided to note where source code files have not been produced. Documents where source code has been redacted, however, need only include labels to note that source code has been redacted.

Dated this 13th day of December, 2021.


Douglas L. Rayes
United States District Judge

# **APPENDIX 1**

Electronically stored information ("ESI") shall have the meaning set forth in Federal Rule of Civil Procedure 34(a)(1)(A) and authorities interpreting that Rule. As required by the Rules, documents shall be produced as they are maintained in the ordinary course of business, including all relevant metadata, and maintaining to the extent reasonably and efficiently possible the documents and attachments or affixed notes as they existed in the original when creating the image file.

## **FILE FORMATTING**

All ESI shall be produced in either (1) native or near-native format; or (2) image files with associated text and load files, formatted as follows:

- Image files shall be single-page, Group IV TIFF (tagged image file format) files. Each image shall have a legible, unique fixed-length numeric identifier (bates number) electronically affixed onto the image in no less than 8-point font. Image files shall be named with the bates number of the page.
- Text files shall contain full extracted text for all file types, one text file per document. Text files shall be named to match the bates number of the first page of the document (Beg Bates Number).
- Johnson shall produce Concordance DAT load files with standard delimiters and accompanied by an Opticon image load file, in .csv format. Proctorio shall produce DAT, OPT load files that can be loaded by Ipro eclipse, with standard delimiters and accompanied by an Opticon image load file, in .csv format. Load files shall contain the metadata listed below.

## **METADATA FIELDS**

If producing documents as image files with text and load files, the load files shall contain metadata that can be reasonably and efficiently extracted for each category below:

| Field Name | Field Description |
|---|---|
| BegBates | Beginning Bates Number |
| EndBates | Ending Bates Number |

| BegAttach | Beginning Bates number of the first document in a document family range. Documents that are part of document families, *i.e.*, containing parents and attachments should receive a value |
| EndAttach | Ending Bates number of the last document in attachment range in a document family range. Documents that are part of document families, *i.e.*, containing parents and attachments should receive a value |
| Custodian | Name of the Custodian of the Document produced |
| Duplicate Custodian | Names of all custodians who had a copy of a document that was removed through the de-duplication process, if applicable LastName_FirstName format |
| FileName | Filename of the original source ESI as stored by the custodian |
| NativeLink | Path and filename to produced Native Format file (see Paragraph 4.4) |
| EmailSubject | Subject line extracted from an email message |
| Title | Title field extracted from the metadata of a non-email document |
| Time Zone | Time zone setting used for data processing |
| Pages | Page Count |
| Author | Author field extracted from the metadata of a non-email document |
| From | From field extracted from an email message |
| To | To or recipient field extracted from an email message |
| Cc | CC or Carbon Copy field extracted from an email message |
| BCC | BCC or Blind Carbon Copy field extracted from an email message |
| DateSent | Sent date and time of an email message (mm/dd/yyyy hh:mm:ss format) |
| DateLastModified | Last modification date and time (mm/dd/yyyy hh:mm:ss format) |
| HashValue | MD5 or SHA-1 hash value |
| File Extension | File extension of a document (.msg, .doc, .xls, etc.) |
| ExtractedText | File path to extracted Text/OCR file |
| Confidentiality | "Confidential" or "Highly Confidential" if a document has been so designated, otherwise blank |
| Attach Count | Number of attached files |

| Message_ID | The Outlook Message ID assigned by the Outlook mail server, if applicable |
|---|---|
| Reference Chain | The Outlook message "Reference Chain" if applicable |
| Embedded Source | The document number of the source file from which the embedded file was extracted (if applicable) |
| Folder Path | Email folder |
| Importance: | Email importance level |

## DOCUMENTS TO BE PRODUCED NATIVELY

Even if a party chooses to produce the bulk of documents as image files with text and load files, the party must produce the following file types as native files. Microsoft Excel and other spreadsheet files, including comma or tab delimited text files, Microsoft Access and other database files, videos, audio files, animation files, and Power Point and other presentation files shall be produced in native format, if available. If a document to be produced in native format contains privileged information, the document will be produced by producing the document in TIFF format with redactions to the extent reasonably, efficiently, and technically possible.

## WORD FILES

Word processing files, including but not limited to Microsoft Word files (*.doc and *.docx), will be produced in .tiff image format and will display tracked changes, comments, or similar data.

## ATTACHMENTS

If any part of an email or its attachments is responsive, the entire email and attachments will be produced, except any attachments that must be withheld or redacted on the basis of privilege.

## SOCIAL MEDIA WEBSITES

All material may be produced by capturing information through "screen shots" or "screen captures" and converting the information into images along with corresponding extracted text or OCR.

Alternatively, the producing party may produce the results of a bulk export of an

account, such as by exporting out a profile from Linkedin or downloading a copy of an individual's Facebook data or archive.

### INSTANT MESSAGING APPLICATIONS

Electronic messages such as text messages, chats, and instant messages (IMs), including both SMS messages sent over cellular networks and messages sent over the Internet using applications such as WhatsApp, Signal, iMessage, Facebook Messenger, Twitter (via direct message), Slack, Google Chat, and many others, must be produced as image files with related searchable text and attachments, in addition to metadata and bibliographic information that can be reasonably and efficiently extracted.

Depending on how the custodian's system represents names in email messages, IMs or text messages, the party may request a table of names or contact lists from custodians. The parties shall meet and confer over such a request.

### ENCRYPTION

The parties will make reasonable efforts to ensure that all encrypted or password-protected documents are successfully processed for review and production and if produced in native format, the decrypted document is produced. To the extent such documents are not successfully processed despite use of reasonable efforts, a placeholder TIFF image may be produced in place of each such document indicating that a security protection could not be removed.

### METHOD OF PRODUCTION

All ESI will be produced via secure file transfer or shareable database link. In the event that the information is too large for a secure file transfer or shareable database link, it will be placed on a hard drive, CD, or another generally-accepted electronic medium.

### MEET AND CONFER

If a party believes that any of the provisions of this ESI Protocol would create an undue burden or are unreasonable or inefficient as to a particular document or type of document, the parties agree to meet and confer about which provisions are reasonably necessary in light of the circumstances.

**<u>OBJECTIONS PRESERVED</u>**

Nothing in this ESI protocol shall be interpreted to require disclosure of documents or ESI protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, protection, or exemption from discovery.

The parties do not waive any objections to the production, discoverability, or confidentiality of ESI, hard copy materials, or any other discovery materials.

Exhibit E



Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109 USA
415.436.9333
eff.org

November 29, 2021

Jacob Canter
3 Embarcadero Center, 26th Fl.
San Francisco, CA 94111
JCanter@crowell.com
*Via E-Mail*

**RE: Erik Johnson v. Proctorio, Inc., Case No. 2:21-cv-00691-DLR**

Dear Mr. Canter,

In the course of preparing documents and ESI for production in response to Defendant Proctorio, Inc.'s requests for production, we learned that some of Plaintiff Erik Johnson's communications through the Signal messaging application ("Signal") were irretrievably deleted by Signal's "disappearing messages" feature.

Disappearing Messages is a default feature of the Signal app. Mr. Johnson has used this feature for as long as he has used the ap. As a result, Mr. Johnson's communications were automatically deleted from his devices one day after being sent or read. Before this litigation was contemplated, as part of his regular practice as a privacy-conscious technology user, Mr. Johnson also deleted the data stored on his smartphone (but not data also stored on a server) approximately every six months. This practice, too, led to the deletion of some Signal messages from Mr. Johnson's smartphone.

In approximately September 2020, Mr. Johnson turned the Disappearing Messages feature off for two specific conversations: a group chat with his classmate Akash Satheesan and Bill Fitzgerald, a reporter from Consumer Reports; and a chat with Mr. Satheesan, Mr. Fitzgerald, and an attorney retained by Mr. Fitzgerald, several weeks later. However, Mr. Johnson deleted these messages in approximately January 2021 when he engaged in his regular practice of deleting data stored on his smartphone.

Mr. Johnson took steps to preserve relevant documents and ESI under the supervision of counsel when he began contemplating filing this lawsuit. However, he did not change the Disappearing Messages default in Signal at that time. Mr. Johnson disabled the Disappearing Messages feature entirely on October 6, 2021 and has since taken

Jacob Canter
November 29, 2021
Page 2 of 4

additional steps to preserve the Signal messages remaining in his possession and control.
He has also suspended his practice of regularly deleting data from his smartphone.

Based on Mr. Johnson's recollection and information from his Signal account, Mr.
Johnson sent or received messages over Signal with the following people where the content
of such messages may have been responsive to any of Proctorio's document requests:

| Name | Relationship | Approx. dates of communication | Subject of communications |
|---|---|---|---|
| Akash Satheesan | Friend from Miami University | August 2020-November 2021 | Proctorio, ProctorTrack |
| Ash | Friend | Unknown-November 2021 | Proctorio |
| Bill Fitzgerald | Consumer Reports | September 2020-November 2021 | ProctorTrack, Proctorio |
| Chris Gilliard | Professor | October 2020-November 2021 | Proctorio |
| Dominic Fitch-Jones | Friend | Unknown-November 2021 | Proctorio |
| Drew Harwell | Journalist, Washington Post | September 2020-November 2021 | Proctorio; security research unrelated to proctoring |
| Gabriel Geiger | Journalist | March 2021-November 2021 | Unknown |
| Ian Linkletter | University of British Columbia | August 2020-November 2021 | Proctorio |
| Jack Liebowitz | Friend at Miami University | October 2021-November 2021 | Proctorio |
| Jackson Zorc | Friend | October 2021-November 2021 | Proctorio |
| Jake Gruentzel | Friend | Unknown-November 2021 | Proctorio |

Jacob Canter
November 29, 2021
Page 3 of 4

| | | | |
|---|---|---|---|
| Jane Manchun-Wong | Friend | January 2019-November 2021 | Proctorio |
| Joe Martinez | Friend | Unknown-November 2021 | Proctorio |
| Josh Constine | Journalist | September 2019 | Security Research unrelated to proctoring |
| Lia Holland | Fight for the Future | Unknown | Proctorio |
| Lindsay Oliver | EFF | September 2020 | Initial contact seeking legal advice. |
| Lukas Murdock | Friend at Miami University | August 2021-November 2021 | Proctorio |
| MJ Banias | Journalist | April 2021-November 2021 | Proctorio |
| Monica Chin | Journalist | October 2020-November 2021 | Proctorio |
| Nick Perry | Friend at Miami University | April 2021-November 2021 | Proctorio |
| Rebecca Heilweil | Journalist | October 2021-November 2021 | Unknown |
| Ryan Mac | Journalist | January 2019-November 2021 | Proctorio |
| Sven | Friend at Miami University | January 2021-November 2021 | Proctorio |
| Tawnell Hobbs | Journalist, Wall Street Journal | March 2021-November 2021 | Proctorio |
| Thomas Germain | Journalist, Consumer Reports | October 2020-November 2021 | ProctorTrack |
| Todd Feathers | Journalist, VICE | October 2020-November 2021 | Proctoring Software, Proctorio |

Jacob Canter
November 29, 2021
Page 4 of 4

| Tyler Sonnemaker | Journalist, Business Insider | September 2020-November 2021 | Proctoring Software |
|---|---|---|---|
| | | | |

      Mr. Johnson will, as stated in his Responses to Proctorio's Requests for Production, produce Signal messages that are nonprivileged and responsive to Proctorio's requests to the extent such messages are in his possession, custody, or control. This includes any deleted messages that he is able to recover, if any.


      Best regards,


      Mitch Stoltz
      Senior Staff Attorney
      Electronic Frontier Foundation

Exhibit F

# EXHIBIT F





⇄ **Erik Johnson Retweeted**

**Lia Holland** @liaholland · Mar 3                    •••

Real talk: for an education, students must enter into a specific, unequal power dynamic. A dynamic that can be readily abused. Right now I guarantee you there are students being abused by authority figures using @proctorio.

Let the thought of that chill you. #BanEProctoring

---

⬛ **Fight for the Future** ✔ @fightfortheftr · Mar 3

NEW: @Proctorio is worse than a proctology exam, and so is their creepy CEO, Mike Olsen. It's time to start calling this racist, ableist stalkerware what it is: MikeOlsenTeenageLapCam.com #InvestigateProctorio

Show this thread



MikeOlsenTeenageLapCam.com
#InvestigateProctorio

---

💬          ⇄ 4          ♡ 3          ⬆

# EXHIBIT G

# PROCTORIO AND ITS CEO ARE WORSE THAN A PROCTOLOGY EXAM



Hundreds of thousands of students around the world are fighting back against creepy e-proctoring app Proctorio and their equally creepy CEO, Mike Olsen.

Major universities like Columbia, Vanderbilt, Howard, and UT Austin, as well as major textbook companies like McGraw-Hill are ignoring student's real and substantiated concerns about the racism, ableism, privacy violations, abuses of power, and bad-spiritedness of Proctorio.

They're allying themselves with this guy, Mike Olsen.



Mike thinks that getting an education should be just like a proctology exam. It should include peeing in a cup, revealing intimate personal information, crying and cursing in front of an authority figure who holds your future in their hands, as well as having your lap area documented repeatedly and sent for analysis steeped in systemic racism and ableism.

But whereas proctology exams are medically important for certain folks over age 55, Mike wants everyone to endure Proctorio at age 18 (or younger), and his favorite part is making it all happen on camera.

This guy is raking in oodles of money by forcing teenagers to submit to an ineffective technology that may be more invasive and damaging than a doctor's finger up your anus. Some people, like racial justice and human rights organizations—as well as a coalition of Senators—are looking into Proctorio's bunk tech that may actually encourage cheating.

SIGN THE PETITION
AGAINST EPROCTORING                    SIGN

Bummer for Mike, because he's all about teenagers being forced to film their laps and their living spaces for untrained and unsupervised professors, teaching assistants, and other authority figures. That's why he founded Proctorio, because some people in education are so worried about students cheating their way through an outdated and ineffective praxis that they will literally make young people film themselves for a spyware app.

The way proctoring apps work is so unclear to some professors that students report crying as they pee in cups on camera because they don't want to be flagged as "cheating."

Seems like that's just Mike's sort of thing.

TELL MIKE HE'S CREEPY

But what Mike doesn't like is criticism. He's the sort of guy to hold a grudge. And boy, this middle-aged adult CEO has got it out for 18 year old Erik Johnson. Erik, a freshman at Ohio's Miami University posted some of Proctorio's code—data that's legal for anyone to see and share—on Twitter. Mike was SO bummed that Erik would dare to interrupt Mike's filming of teenage laps that he made his lawyers intimidate Twitter into taking Erik's posts down.

And there was that one time where another student said something mean about Mike's cams on Reddit. Mike wouldn't stand for it, so he logged into Proctorio's customer service database and posted private information about that student in the comments.

Sick burn, Mike.

There's more, like Mike's SLAPP lawsuit against University of British Columbia educational technologist Ian Linkletter—and the fact that Proctorio uses racially biased facial recognition software. Mike gets real pissy when you call it that, though. He prefers "facial detection"—when in fact all facial analysis algorithms are imperfect, bunk, racist science that deserve no place in assessing who is a "cheater" when it comes to taking tests that might determine a young person's future.

Despite Mike's self-aggrandizing Twitter handle "@ArtfulHacker" (a characterization from a 1990s PC Magazine article that lives on only in every bio Mike writes for himself), we as digital rights experts can definitively state that Mike isn't 'artfully hacking' anything. He's creepy and Proctorio is too.

Every time we speak with someone who has encountered Mike Olsen, we learn about something else gross about him. Here's a partial list:

- Mike's shitty PR team really had to reach for Earth Day 2021—claiming responsibility for the reduced greenhouse gas emissions from pandemic shutdowns across the globe.
- Mike lying that Proctorio's facial recognition/analysis/whatever-he-calls-it-today tech isn't biased, even though it's proven to actually be a white-labeled racist technology that can't detect Black faces 57% of the time.
- Mike celebrating that articles about his tech being racist and "Orwellian" make him more money
- Mike belittling student's concerns: "It's hilarious, students pretending to care where their data goes. Whether they're cheating or not, I don't really care, but then they go out and they just say things. They don't do any research, they just make things up."
- Mike's "bizarre" SLAPP lawsuit against University of British Columbia educational technologist Ian Linkletter
- Mike's "freakishly disrespectful" posting of private chatlogs between a student and customer service on Reddit: ""If you're gonna lie bro… don't do it when the company clearly has an entire transcript of your conversation."
- Mike "absolutely inappropriate" abuse of Twitter's DMCA process to remove a student's critical tweets
- The peer-reviewed article on the "eugenic gaze" of Proctorio that Mike tried to get a journal to retract
- Mike's "insane" efforts to intimidate an 18-year-old critic of Proctorio via Twitter DM and by blocking his IP address from accessing Proctorio's platform
- Documents obtained under the freedom of information act that show, for example, that at least 408 different people at Texas Tech University may have access to Proctorio files of K-12 as well as university students using the technology that Mike tried to get removed from Muckrock
- Mike's big lie about who Proctorio's clients actually are on Proctorio's homepage in February 2021.
- Mike telling The Washington Post "We're the police."
- Mike telling Business Insider "I didn't get into proctoring to fix a pedagogical problem. I'm not a pedagogical expert, I don't know if there are better ways to do things."
- Mike trying to intimidate people who used the Freedom of Information Act to learn more about Proctorio at universities—creating an "enemy list" of critic names

Got a story about Mike and feel like sharing? Send it to us at team@fightforthefuture.org.

Built by:

For press inquiries, please contact us at:
(508) 474-5248 or press@fightforthefuture.org

This page was created by digital rights organization Fight for the Future, who are certain that proctoring apps should be banned, and that Mike would need his lawyers to hack him out of a paper bag.

You can contact us at team@fightforthefuture.org.